**Carolee Brady HARTMAN, et al., Plaintiffs,**

v.

**Charles Z. WICK, Defendant.**

**Civ. A. No. 77–2019.**

United States District Court,
District of Columbia.

Jan. 19, 1988.

As Amended Jan. 29 and Feb. 16, 1988.

Bruce A. Fredrickson, Susan L. Brackshaw, and Bonnie A. Suchman, Webster & Fredrickson, Washington, D.C., for plaintiffs.

Robert E.L. Eaton, Jr. and Stuart H. Newberger, Asst. U.S. Attys., Lorie J. Nierenberg and Richard H. Swan, Office of the Gen. Counsel, U.S. Information Agency (of counsel), on brief, Joseph E. DiGenova, U.S. Atty. and Royce C. Lamberth, Asst. U.S. Atty., for defendant.

Table of Contents

INTRODUCTION .................................................................................. page 319

I. THE NEW LAW SET FORTH BY THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA IN PALMER V. SHULTZ MAY NOT BE APPLIED RETROACTIVELY IN THIS CASE ............................................................................................ 319

II. THE OCCUPATIONAL CATEGORIES AT ISSUE IN THIS SUIT .... 320

 A. The job categories in which the Court found discrimination have been reclassified ........................................................................... 320

 B. Foreign Service Officer applicants are included in the plaintiff class unless they actually sought relief under the consent decree in *Palmer v. Shultz* ............................................................................ 321

 C. Women who submitted multiple applications and were later hired for one position are eligible for inclusion in the plaintiff class .... 324

D. The plaintiff class includes women who were denied a position that was allegedly filled by another woman ........................................ 324

E. The plaintiff class includes non-resident aliens who applied for USIA jobs to be performed in the United States ............................. 324

III. TO BE A MEMBER OF THE PLAINTIFF CLASS, A WOMAN MUST HAVE APPLIED FOR ONE OF THE POSITIONS AT ISSUE IN THIS SUIT BETWEEN OCTOBER 8, 1974 AND NOVEMBER 16, 1984 .... 325

A. The plaintiff class opens on October 8, 1974 ................................ 325

B. The plaintiff class closes on November 16, 1984 ......................... 328

IV. EXCEPT FOR FOREIGN SERVICE APPLICANTS, CLASS MEMBERS WHO WISH TO PARTICIPATE IN CLASS RELIEF ARE ENTITLED TO INDIVIDUALIZED DETERMINATIONS OF THEIR CLAIMS ... 328

A. The large majority of class members has not been identified ...... 328

B. Notice will be mailed to identified class members and, because of the large number of unidentified class members, notice by posting, publication, and memoranda will also be ordered. In addition, plaintiffs will be permitted to conduct limited discovery in order to identify additional class members who may have been encouraged to apply for the jobs at issue by word-of-mouth recruitment ........... 329

C. The content of the notice must explain the basic facts about this suit, including the definition of the plaintiff class, the Court's finding of liability, the Court's remedial order, and what potential class members must show in order to be eligible for a determination of defendant's liability to each of them ............................ 331

D. The proof-of-claim forms must ask plaintiffs to show that they applied for a job within one of the relevant job categories during the relevant time period and that they were rejected ..................... 332

E. The claims of class members who were not Foreign Service applicants will be determined through individual *Teamster* hearings unless the parties can agree on an alternative procedure ........... 333

F. The Court will determine whether *Teamster* hearings should be conducted by a United States Magistrate or by one or more Special Masters once class members have submitted proof-of-claim forms 334

G. Burden of proof at the *Teamster* hearings ................................ 335

V. REMEDIES FOR SUCCESSFUL INDIVIDUAL CLAIMANTS WHO WERE NOT FOREIGN SERVICE APPLICANTS ................................ 335

A. Plaintiffs are entitled to back pay .............................................. 336

B. Plaintiffs who request employment with the Agency but cannot be hired immediately are eligible for front pay as well ..................... 337

C. Class members were obligated to make reasonable efforts to mitigate damages, and the monetary awards must be reduced by the mitigating earnings ...................................................................... 337

D. Plaintiffs who request positions with the Agency are eligible for hiring priorities and retroactive promotions ................................ 338

VI. RELIEF FOR FOREIGN SERVICE APPLICANTS TO THE UNITED STATES INFORMATION AGENCY .................................................... 338

A. The Court will model the relief for Foreign Service applicants to the United States Information Agency on the consent decree in *Palmer v. Shultz* ...................................................................................... 338

VII. THE COURT WILL NOT ORDER PROSPECTIVE RELIEF .............. 340

VIII. THE COURT WILL RESERVE JUDGMENT ON PLAINTIFFS' REQUEST FOR ATTORNEY'S FEES .................................................... 341

IX. CONCLUSION ...................................................................................... 341

## INTRODUCTION

CHARLES R. RICHEY, District Judge.

By Order of April 19, 1978, the Court conditionally certified this case as a class action. That class consisted of "all women who have applied for employment with or are currently employed by the United States Information Agency and who have been or continue to be adversely affected by the discriminatory employment practices of the defendant." [1] On November 16, 1984, this Court found that defendant had "discriminated against women as a class with regard to hiring" in six occupational categories at the defendant agency. *Hartman v. Wick*, 600 F.Supp. 361, 375 (D.D.C. 1984). That Opinion details the background of this long-lived litigation, as does *De Medina v. Reinhardt*, 686 F.2d 997, 1000–01 (D.C.Cir.1982), an appeal of an earlier decision in this case.

The Court's 1984 Opinion and Order dealt solely with the question of liability. From January 12, 1987, through January 14, 1987, the Court held a trial to determine appropriate remedies. At trial, and in their post-trial submissions, the parties clarified the areas of agreement and disagreement about the proper scope and contour of remedies in this case. The Court has carefully considered the testimony, the exhibits, the pre-trial and post-trial briefs of both parties, and the underlying law. On the basis of the record and the law, the Court has made the following determinations.[2]

## I. THE NEW LAW SET FORTH BY THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA IN PALMER V. SHULTZ MAY NOT BE APPLIED RETROACTIVELY IN THIS CASE.

■ The Court must first note that the Court of Appeals for this Circuit has recently wrought a significant change in the law governing the use of statistics in a discrimination case. In *Palmer v. Shultz*, 815 F.2d 84 (D.C.Cir.1987), the D.C. Circuit distinguished between "one-tailed" and "two-tailed" statistical analyses.[3] Ending its earlier silence on this issue, the Circuit stated that "although we by no means intend entirely to foreclose the use of one-tailed tests, we think that generally two-tailed tests are more appropriate in Title VII cases." *Id.* at 95.

If the *Palmer* decision were applied retroactively to the case at bar, the Court's 1984 finding of liability might be questioned, as it was based on a "one-tailed" statistical test that might no longer be deemed appropriate in this type of suit. *See Hartman v. Wick*, 600 F.Supp. 361, 369, 375 (D.D.C.1984). Consequently, the Court must consider whether *Palmer's* strong suggestion that courts should employ a "two-tailed" analysis should be applied retroactively in this case.

In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971), the seminal case on retroactive application of new case law, the Supreme Court noted that, although retroactive application is the usual rule, three factors may counsel against retroactivity:

First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have

---

1. On October 24, 1979, the Court excluded female applicants for clerical positions from the plaintiff class.

2. This Opinion shall constitute the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

3. In the argot of statisticians, a "one-tailed test" examines whether one group is disfavored in hiring decisions while a "two-tailed test" considers whether the same group both receives preferential treatment and faces any discrimination. *Palmer v. Shultz*, 815 F.2d 84, 94–96 (D.C.Cir. 1987) (outlining differences between one-tailed and two-tailed tests).

relied ... or by deciding an issue of first impression whose resolution was clearly foreshadowed.... Second, [a court] ... must 'weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' ... Finally [a court must weigh] the inequity imposed by retroactive application, for "(w)here a decision ... could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Id.* at 106–07, 92 S.Ct. at 355 (*quoting Linkletter v. Walker,* 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965) *and Cipriano v. City of Houma,* 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969)).

These factors suggest that retroactive application of *Palmer* would be inappropriate in this case. First, prior case law did not "foreshadow" *Palmer's* near-requirement of a two-tailed test; in fact, the *Palmer* court confessed "some trepidation" in approaching this uncharted issue. *Palmer v. Shultz,* 815 F.2d at 92. Second, failure to use a "two-tailed" test in this case will have no effect whatever on use of the test in subsequent cases. Moreover, equity clearly counsels against retroactive application of *Palmer's* preference for two-tailed tests. When remanding this very case, the Court of Appeals expressed approval for the statistical method that would later underlie the liability finding. *Hartman v. Reinhardt,* 686 F.2d 997,

1009–1010 (D.C.Cir.1982). In light of that decision, and the resources devoted to this suit as a consequence thereof, the Court finds that equity prevents retroactive application of *Palmer v. Shultz* in this suit.

## II. THE OCCUPATIONAL CATEGORIES AT ISSUE IN THIS SUIT.

A. *The job categories in which the Court found discrimination have been reclassified.*

In its 1984 decision on liability, the Court found that the United States Information Agency ("USIA" or "the agency") had discriminated against women applicants for jobs in six major occupational categories: Electronic Technician (Series 856), Foreign Language Broadcaster (Series 1048), Production Specialist (Series 1071), Writer/Editor (Series 1082), Foreign Information Specialist (Series 1085), and Radio Broadcast Technician (Series 3940). *Hartman v. Wick,* 600 F.Supp. at 370. Three categories have been reclassified and now have titles and job series numbers different from those described in the 1984 suit. *See* Defendant's Exhibit No. ("Def.Ex.") 3.[4]

As plaintiffs applied for and were unlawfully denied jobs with the abandoned title and series number, they may well not realize the newly categorized job series include the posts they originally sought. Consequently, the Court will order that the notice to potential class members refer to the jobs at issue by both former and current names and numerical categories.

---

**4.** On his Exhibit 3, defendant notes that three of the six job series have been redesignated as follows:

| Former Series | Current Series |
| --- | --- |
| Foreign Language Broadcaster (1048) | IRB (Other) (1001) |
| Writer/Editor (1082) | Writer/Editor (1082) IRB (English) (1001) IRB (Other) (1001) |
| Foreign Information Specialist (1085) | IRB (English) (1001) IRB (Other) (1001) |

Again according to Defendant's Exhibit 3, the following series were not reclassified: Electron-

ic Technician (856); Production Specialist (1071); Radio Broadcast Technican (3940).

Plaintiffs question whether Exhibit 3 fully reflects the actual reclassification of the Foreign Information Specialist Series (1085), as it excludes those positions reclassified into Series Number 130. *Plaintiffs' Post–Trial Reply Brief,* at 4. Defendants admit that Series 130 contains the foreign service officer jobs for which class members applied. *Transcript* at 337 (Testimony of Bliss Cornell Cartwright, Senior Research Analyst, Longbranch Research Associates). As detailed below, because there is no basis on which to exclude all foreign service applicants from the plaintiff class, Series 130 is one of the job series at issue in this remedial order.

**B.** *Foreign Service Officer applicants are included in the plaintiff class unless they actually sought relief under the consent decree in Palmer v. Shultz.*

In its 1984 Opinion and Order, the Court found that female Foreign Service officer applicants were among the women against whom defendant had discriminated in hiring. 600 F.Supp. at 370.[5] Prior to the January, 1987, trial on remedies, defendant moved for partial summary judgment on claims raised by unsuccessful female applicants for the Foreign Service who sought appointment at USIA after December, 1980. At the January 8, 1987, pre-trial, the Court denied that motion, without prejudice to renewal after trial. Defendant has now renewed that motion, which the Court will now deny with prejudice in all but one respect and will grant with respect to one group of foreign service candidates.

Defendant raises several arguments to support his summary judgment motion. First, he maintains that unsuccessful Foreign Service applicants cannot be considered "applicants" for the positions at issue in this suit and therefore cannot be part of the plaintiff-applicant class. *Defendant's Post–Trial Brief* at 3–4. The trial record does not support this assertion.

During the first trial in this case, defendant produced evidence showing that (former) Job Series 1085 largely consisted of Foreign Service officers. *Transcript,* June 1, 1979, at 8–10; 103–03; 117–20; 144–50 (Testimony of Dr. Seymour Wolfbein). Plaintiffs' expert reached the same conclusion. *Id.* at 64–165, *in passim* (Testimony of Dr. Marc Rosenblum). As Job Series 1085, also called the Foreign Information Specialist Series, was one of the series in which defendant is liable for sex discrimination in hiring, *Hartman v. Wick,* 600 F.Supp. at 372, defendant would have to prove that Foreign Service applicants can no longer be considered "applicants" to that job series or any successor designation.

First, Defendant has not produced any evidence suggesting that Job Series 1085 changed during the relevant time period so as to exclude Foreign Service officer applicants. To the contrary, defendant's own expert stated during the 1987 trial that Series 1085, and its successor Series 130, *include* Foreign Service officers. *Transcript,* at 337–38 (Testimony of Bliss Cornell Cartwright, Senior Analyst, Longbranch Research Associates) ("Cartwright Testimony"). As such, this argument does not support exclusion of Foreign Service applicants to USIA from the plaintiff class.

Nor does defendant gain support from his argument that Foreign Service applicants should be excluded from the class because they do not specify that they wish to be placed in the USIA job series. The testimony establishes that Foreign Service applicants are placed wherever the Board of Examiners believes them best suited. *Transcript,* at 96–110 (Testimony of Frontiss Burbank Wiggins, Jr., Director of Policy and Coordination for Director General, Department of State) ("Wiggins testimony"). Among such Foreign Service slots are those in the successor job series to Job Series 1085. *Id.* Thus, if Foreign Service candidates "apply" anywhere, they apply, *inter alia,* to a Job Series at issue in this suit.

Next, defendant argues that the Department of State is unilaterally responsible for testing potential Foreign Service officers and therefore the defendant United States Information Agency cannot afford relief to aggrieved Foreign Service applicants. This is the same argument that defendant raised in his unsuccessful Motion to Dismiss and his Motion to Reconsider the Court's denial of that motion. The Court continues to believe that its earlier decisions are correct and stands by the reasoning set forth in its December 24, 1986, Order.

Moreover, the testimony at trial undercuts any argument that defendant cannot afford relief to potential Foreign Service Officers. There is no question that the Board of Examiners, which conducts and

---

**5.** These women had largely applied for what had been categorized Foreign Information Specialist Job Series 1085. *Hartman v. Wick,* 600 F.Supp. at 370.

evaluates foreign service examinations, is not controlled by the State Department but is an inter-agency board on which USIA officials serve as equal partners. *Transcript*, at 95–96 (Wiggins testimony). Although the agencies participating in the Junior Foreign Service Officer program have jointly tested candidates since December, 1980, one section of the written exam is substantially designed by the USIA and used solely to evaluate candidates' potential for USIA employment. *Id.* at 96–99. Candidates must pass this section of the test to be considered for a foreign service post within USIA. *Id.* Even though the Board of Examiners may in theory determine the passing score, the Board customarily allows USIA to set the passing score on this portion of the exam in order to assure the necessary number of candidates for USIA employment. *Id.* at 99–100.

The evidence at trial revealed that, at least in some Foreign Service programs, the USIA also exerts control over other stages of the Foreign Service applicant process. Candidates for "Mid–Level" programs do not sit for the written Foreign Service examination but proceed directly to the Oral Assessment of potential Foreign Service officers. *Id.* Plaintiffs showed that USIA controlled the selection of these Mid–Level officials and in fact misused the selection process for political purposes. Plaintiffs' Exhibit Number ("Pl.Ex.") 231 ("RLC: Subj: BEX/Affirmative Action Program"); *Transcript* at 122–24 (Wiggins testimony). Indeed, plaintiff even adduced unrebutted evidence showing that USIA vetoed at least one Mid–Level applicant because there were "enough women in the Foreign Service at mid-level." Pl.Ex. 230 (Memo from Cowan to Albright Re Candidacy of Dr. Shirley Hill–Witt).

In sum, Junior Foreign Service applicants to the United States Information Agency take an examination that is developed in pertinent part by that agency and scored in pertinent part by that agency.

The State Department does not control the portion of the Foreign Service selection process that is specifically dedicated to evaluating Foreign Service applicants to the United States Information Agency. And the United States Information Agency can exert substantial control over the so-called "objective" Oral Assessment process and review. Thus, there is no merit to defendant's claim that the Foreign Service examination process is outside the control of the defendant in this case.

Finally, defendant argues that the claims of these applicants have been resolved through the consent decree entered in *Palmer v. Shultz,*[6] Civil Action No. 76–1439, and thus are barred by the doctrines of *res judicata* and collateral estoppel. While this argument is largely unconvincing, the Court will grant defendant's motion for summary judgment as to one particular group of foreign service applicants.

█ *Res judicata* and collateral estoppel are affirmative defenses that are waived unless specifically and timely raised. *See, e.g.,* C.A. Wright and A. Miller, *Federal Practice and Procedure:* Civil § 4405. Defendant neither raised these defenses in his answer nor sought leave to amend his answer to include them. As such, defendant may not raise either bar if he is guilty of "undue delay, bad faith, or dilatory motive" and plaintiff would experience "undue prejudice" if the defense were permitted. *See, e.g., Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Plaintiffs' burden is inversely proportional to the length of delay: the longer defendant has waited, without explanation, to raise the defense of preclusion, the lesser amount of prejudice must plaintiffs show. *See, e.g., Evans v. Syracuse City School District,* 704 F.2d 44, 47 (2d Cir.1983).

█ Defendant's unexplained delay in raising his claims of preclusion was extreme. Defendant states that the *Palmer*

**6.** As explained below, *Palmer v. Shultz* was a class lawsuit alleging that the State Department had unlawfully discriminated against women in the Foreign Service. The consent decree settled one portion of the suit. Under the consent decree, the Department of State agreed to implement a series of steps designed to rectify alleged discrimination in hiring women for Junior Foreign Service Officer positions. *See* Pl.Ex. 204 (*Palmer* consent decree).

*v. Shultz* consent decree that allegedly resolved the claims of unsuccessful foreign service applicants to the USIA was entered on October 12, 1983. Yet defendant never broached the issue of preclusion prior to this Court's November, 1984, finding of liability in the instant case. Nor was the *Palmer* decree mentioned prior to the originally scheduled September, 1986, trial date, or even prior to December 21, 1986, when the rescheduled trial was to have occurred. In fact, it was not until December 23, 1986, more than three years after the decree was entered, after trial of the remedial phase of this action was to have begun, and on the eve of the rescheduled January, 1987, trial, that defendant brought the possibility of preclusion to the Court's attention.

Defendant has offered no explanation for his three-year delay in raising the *res judicata* and collateral estoppel defenses. To allow defendant to inject the possibility of issue or claim preclusion after this long and unexplained delay would inevitably prejudice plaintiffs' case. For nearly three years, plaintiffs have framed their case and formulated their legal strategy on the assumption that the *Palmer* consent decree was not relevant to this case. This prejudice alone is ample ground on which to deny defendant's motion for partial summary judgment. *See Evans v. Syracuse City, School District*, 704 F.2d at 46–47 (significant delay in raising affirmative defenses "invariably" causes prejudice).

Although the Court is convinced that plaintiffs would be prejudiced if defendant were permitted to raise the collateral estoppel and *res judicata* defenses, plaintiffs themselves do not elaborate upon the prejudice they have suffered. Accordingly, the Court will not deny defendant's motion on grounds of waiver alone. There is, however, another reason that the Court must deny defendant's motion.

In order to maintain a *res judicata* or collateral estoppel defense, defendant must first offer sufficient evidence that foreign service applicants to USIA were parties or in privity to the parties to *Palmer v. Shultz* and were eligible for relief under the consent decree. *Allen v. McCurry*, 449

U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). Defendant has not done so.

First, defendant does not offer argument, citation to case law, or citation to the record to support his claims of preclusion. Rather, he merely notes that the consent decree in *Palmer v. Shultz* was binding on all applicant class members except those who "opted out" of the *Palmer* plaintiff class and implies that the *Palmer* class consisted of *all* women who applied for Junior Foreign Service Officer positions from February 4, 1976, through October 12, 1983. These allegations are not supported by the trial record.

The record demonstrates that the relief afforded by the consent decree was available *only* to Foreign Service applicants who sought appointment *to the State Department*. Transcript at 79–80 (Wiggins testimony) (emphasis added). Indeed, the *Palmer* class notice asked class members to state that they sought employment in one of four "functional fields," all of which related to jobs only in the State Department. *Id.* at 85 (Wiggins testimony). The class notice itself stated that the *Palmer* class consisted only of women who applied for Junior Foreign Service positions *within the State Department*. Defendant's Motion for Partial Summary Judgment, Attachment B. Equally telling, any respondent to the class notice who expressed interest in a job at the USIA was told categorically that she could not be hired under the *Palmer* decree and would have to compete for a USIA spot under a different program. *Transcript* at 87 (Wiggins testimony).

Thus, Foreign Service applicants who sought a post at the United States Information Agency—in other words, the Foreign Service applicants who are unquestionably members of the plaintiff class in this lawsuit—were not eligible for relief under the *Palmer* decree. The Court can only conclude from the unrebutted trial record that Foreign Service applicants to the United States Information Agency were neither parties nor privies to the consent decree in *Palmer v. Shultz* and the defenses of *res*

*judicata* and collateral estoppel therefore may not be invoked.

Although the Court has found that the *Palmer* plaintiffs and the plaintiffs in this case are conceptually separate and identifiable classes, the Court realizes that some Foreign Service applicants who preferred appointment to USIA may nevertheless have sought appointment to the State Department under the procedures set forth in the *Palmer* decree. As post-December, 1980 applicants could not indicate a preference for USIA appointment when they applied to the Foreign Service, *Transcript* at 88–89 (Wiggins Testimony), the Court must assume that women who sought relief under the *Palmer* decree were primarily interested in State Department positions and therefore ineligible for any remedy in this case.

Indeed, equity commands this finding, else some women might seek recovery under both *Palmer* and this case for what amounts, at base, only to one "act" of discrimination. This result is bolstered by the *Palmer* consent decree, which specifically states that it represents the full settlement of all claims of discrimination against members of the *Palmer* plaintiff class. Pl.Ex. 204; *see also, e.g., Southern Pacific Communications Co. v. American Telephone and Telegraph Co.*, 740 F.2d 1011, 1021 (D.C.Cir.1984). Therefore, the Court will grant defendant's motion for summary judgment *only* with respect to those female Foreign Service applicants who sought relief under the *Palmer* consent decree and must therefore be deemed members of the *Palmer* plaintiff class.

C. *Women who submitted multiple applications and were later hired for one position are eligible for inclusion in the plaintiff class.*

■ Defendant argues that potential class members who applied for several jobs, were rejected for at least one, and were ultimately hired for one position must be excluded from the plaintiff class. *See Defendant's Post–Trial Brief* at 3. Neither logic nor law supports this position.

At base, defendant's argument suggests that a woman who was unlawfully denied employment on the basis of sex discrimination can recover nothing if she is hired when she applies for the same or a similar job several years later. While a plaintiff cannot recover relief for any period after she obtains the position sought, her right to a remedy for the years in which she was denied employment cannot be erased by defendant's belated decision to forswear sex discrimination in hiring. *See Ford v. Equal Employment Opportunity Commission*, 458 U.S. 219, 227 n. 9 & 232–34, 102 S.Ct. 3057, 3063 n. 9, 3066, 73 L.Ed.2d 721 (1982). The law demands that any member of the plaintiff class who was ultimately employed by defendant obtain a remedy based on the amount of time in which she experienced discrimination and its effects. The fact that she subsequently achieved her goal cannot erase this basic right.

D. *The plaintiff class includes women who were denied a position that was allegedly filled by another woman.*

■ Defendant argues that the Court must exclude from the plaintiff class any woman who applied for a position at issue in this suit that was filled by another woman. This is incorrect as a matter of law.

As detailed below, once a particular plaintiff has carried her burden of proof and shown that she is entitled to relief, defendant may produce evidence showing that there was a legitimate, non-discriminatory reason for failing to hire the female applicant. *See* pp. 335–336, *infra*. Defendant may at that time prove that a different woman was hired for the same position, *see, e.g., Harrison v. Lewis*, 559 F.Supp. 943, 946 (D.D.C.1983), and plaintiff may attempt to show that this action was pretextual. *Id.* Thus, while a plaintiff may not be entitled to recover if she was denied a position in favor of another woman, she is nonetheless eligible for an individualized determination of her claims. *Id.*

E. *The plaintiff class includes non-resident aliens who applied for USIA jobs to be performed in the United States.*

■ Title VII explicitly excludes aliens employed "outside any State" from its protections. *See* 42 U.S.C. § 2000e–1. Defendant urges the Court to interpret this

language as excluding from Title VII's protections non-resident aliens employed within the United States and therefore asks the Court to exclude potential class members who were neither citizens nor residents of the United States when they applied for one of the jobs at issue in this suit.[7] This claim has been rejected by another Court, *see Seville v. Martin Marietta Corp.*, 638 F.Supp. 590, 592 (D.Md.1986), and this Court must reject it as well.

Nothing in Title VII's language, or its legislative history, supports exclusion of aliens employed in the United States from the Act's scope. 42 U.S.C. § 2000e; *see also, e.g.*, H.R.Rep. No. 914, 88th Cong., 2d Sess., *reprinted in*, 1964 U.S.Code Cong. & Ad. News 2355, 2393. And, as courts must give the language of civil rights statutes "broad and inclusive effect," and must extend their coverage to the outer limits permitted from a fair reading of the statute, Sutherland Stat. Const. § 74.05 (4th ed.), there is no basis upon which the Court can exclude non-resident aliens from the Act's stateside scope.

Thus, in light of the plain language of the statute, the silent legislative history, and accepted rules of statutory construction, the Court must find that Title VII applies to non-resident aliens who apply for employment within the United States. Any such potential members of the plaintiff class will be able to seek relief through the mechanism afforded by the Court in this Opinion and the accompanying Order.

III. TO BE A MEMBER OF THE PLAINTIFF CLASS, A WOMAN MUST HAVE APPLIED FOR ONE OF THE POSITIONS AT ISSUE IN THIS SUIT BETWEEN OCTOBER 8, 1974 AND NOVEMBER 16, 1984.

A. *The plaintiff class opens on October 8, 1974.*

 A federal class action is "a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions." *American Pipe and Construction Co. v. Utah*, 414 U.S. 538, 550, 94 S.Ct. 756, 764, 38 L.Ed.2d 713 (1974). Consequently, the filing of a class suit tolls the applicable statute of limitations so that potential class members need not file separate actions simply to avoid a statute of limitations bar. *Id.* at 550–51, 94 S.Ct. at 764–65.

 In the Title VII context, the law provides that the timely administrative charge of discrimination generally tolls the applicable limitations period for all those who could join in that complaint as a class. *See, e.g., Movement for Opportunity and Equality v. General Motors Corp.*, 622 F.2d 1235, 1248 (7th Cir.1980); *McDonald v. United Air Lines, Inc.*, 587 F.2d 357, 361 (7th Cir.1978), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979); *Laffey v. Northwest Airlines, Inc. (Laffey I)*, 567 F.2d 429 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). More precisely, only those individuals who *could have filed* a discrimination claim at or after the time a named plaintiff first brought an administrative charge are eligible for class membership and do not themselves have to pursue administrative process. *E.g., id.; see also, e.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed. 2d 280 (1975); *Dodge v. Giant Food, Inc.*, 488 F.2d 1333, 1333–34 n. 1 (D.C.Cir.1973) (per curiam). Because a federal employee must file a charge of discrimination within thirty days of the allegedly discriminatory act, *see* 29 C.F.R. § 1613.213(a)(1)[8], a class of federal employee plaintiffs "opens" thirty days prior to the date on which a named plaintiff sought an administrative remedy for defendant's sex discrimination in hiring. *See, e.g., Laffey I*, 567 F.2d at 472.[9]

The parties agree that the plaintiff class should open on the date a person who later

---

7. The Court has not been asked to consider whether the protections of Title VII extend to non-resident aliens applying for positions abroad. See *Plaintiff's Post–Trial Reply Brief*, at 31.

8. During the time period relevant to this action, this regulation was found at 5 C.F.R. § 713.214(a)(1)(i)(1974).

9. Defendant apparently does not agree that thirty days is the proper reference point; rather,

brings suit files an administrative complaint of discrimination. The parties disagree, however, about the precise date to which the Court must look. Defendant urges the Court to look to the date on which a named plaintiff filed a formal administrative complaint; in contrast, plaintiffs would have the Court look to the date on which a named plaintiff first initiated the required *administrative processing* of her charge. Thus, plaintiffs claim, the Court must use the date on which a named plaintiff filed a formal grievance, a prerequisite to the filing of a formal administrative charge. 29 C.F.R. § 1613.214(a)(i) (1987).

■ Plaintiffs are correct. To determine when the statute of limitations is tolled, a Court must look to the date on which a class representative initiated mandatory *administrative processing* of a discrimination charge. *See, e.g.,* 29 C.F.R. § 1613.213; *see also,* 5 C.F.R. § 713.214 (1974). Where, as here, counseling is a prerequisite to the filing of an administrative complaint of discrimination, *id.,* the date on which counseling was requested is the date that the class opens. *See, e.g., McDonald v. United Air Lines, Inc.,* 587 F.2d at 361.

There is, however, a more complicated area of disagreement with respect to the opening date of the class. Defendant would have the Court set the opening date with reference to the administrative complaint filed by named plaintiff Carolee Brady Hartman on March 3, 1977. *See* Def.Ex. 85, Part I. Plaintiffs would have the Court look instead to the administrative complaint filed by named plaintiff Toura Kem on November 7, 1974. *Id.* at 93, Part I.

Defendant advances two arguments against the use of Ms. Kem's complaint as the referent for the opening date of the class. First, defendant maintains that, unlike Ms. Hartman's, Ms. Kem's administrative complaint did not explicitly allege dis-

crimination against a *class* of women and therefore did not provide adequate notice that defendant might face a class suit. *See Defendant's Post–Trial Brief,* at 2. In addition, defendant contends that Ms. Kem is not a "named plaintiff" for the purpose of determining the opening date of the plaintiff class because she became a named plaintiff only when the Court ordered Ms. Kem's separate lawsuit consolidated with this one. *See Defendant's Post–Trial Reply Brief,* at 2–3

There is no merit to either of defendant's arguments. The Court will address each in turn.

■ First, an administrative complaint need not specify that it contains class allegations. *Foster v. Gueory,* 655 F.2d 1319, 1322–23 (D.C.Cir.1981). The law clearly holds that a federal employee puts the agency on notice that it may be subject to a class-wide claim of discrimination when he or she files an administrative charge of discrimination, even if the charge purports to be filed only on the signatory's behalf. *See, e.g., Paskuly v. Marshall Field & Co.,* 646 F.2d 1210, 1211 (7th Cir.1981) (per curiam); *McDonald v. United Air Lines, Inc.,* 587 F.2d 357, 361 n. 11 (7th Cir.1978), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979); *Allen v. Amalgamated Transit Union Local 718,* 554 F.2d 876 (8th Cir.), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977).

■ In fact, federal regulations in effect when Ms. Kem's 1974 complaint was filed did not clearly allow an agency to consider a "class" claim. *Barrett v. United States Civil Service Commission,* 69 F.R.D. 544, 553 (D.D.C.1975). Indeed, when Ms. Hartman filed her "class" complaint, the agency Administrator responded that he was "not authorized to accept class action suits" and summarily dismissed the complaint. Def. Ex. 85, Part II, Tab A. Given both the relevant case law and the history of the treatment afforded to Ms. Hartman's complaint, the Court cannot find

defendant contends that class membership opens 180 days prior to the filing of the relevant administrative complaint. This is an incorrect statement of the law. *See* 29 C.F.R.

§ 1613.213(a)(1)(1986); 5 C.F.R. § 713.214(a)(1)(i); *see also McKenzie v. Sawyer,* 684 F.2d 62, 72 n. 8 (D.C.Cir.1982); *Laffey v. Northwest Airlines,* 567 F.2d at 472.

that it is barred from considering Ms. Kem's administrative charge because the charge did not clearly state that it was filed on behalf of a class. *See, e.g., Bachman v. Collier*, 73 F.R.D. 300, 303 (D.D.C. 1976) ("class" caption not required if it would have been a "futile act.").

Moreover, defendant is wrong to allege that Ms. Kem's charge provided no notice of the possibility that defendant might face a class suit. By explicitly calling her charge a claim of discrimination "against females" at USIA, Def. Ex. 93, Part III, and not just on her own behalf, Ms. Kem surely informed defendant that a class suit might follow. Indeed, she may actually have come as close to filing a class administrative claim as was then possible. Thus, the contention that Ms. Kem's claim cannot be the administrative predicate for this class lawsuit cannot stand.

Defendant's other argument against the use of Ms. Kem's claim is that Ms. Kem was not originally a named plaintiff in this suit and therefore "the fact that Ms. Kem eventually became a named plaintiff ... is of little consequence other than to establish her class membership." *Defendant's Post-Trial Reply Brief*, at 2. Defendant argues that "case law and equity" mandate against use of the date of Ms. Kem's claim as the benchmark for opening the class. Quite in contrast to defendants' proposition, law and equity require the use of Ms. Kem's complaint.

■ If defendant's objection is merely that Ms. Kem was not originally a co-plaintiff in this suit but became a named plaintiff when her case was consolidated with the Hartman case, it must fail. The law clearly provides that an administrative complaint filed by a litigant not originally a party to the particular suit can be the basis for determining the opening date of a plaintiff class. *See, e.g., McDonald v. United Air Lines*, 587 F.2d at 361 n. 11.

If defendant is maintaining that only a complaint filed by a named plaintiff can provide adequate notice of the eventually resulting lawsuit, it still fails. The purpose of the administrative filing requirement is "to give notice to the charged party and

enable the Commission to conciliate" the allegation of discrimination. *Laffey I, Inc.*, 567 F.2d at 472. This purpose is "adequately served by a timely filing by any member of the class." *Id.* Because notice and a chance for conciliation are provided whether or not the administrative complainant becomes an "originally named plaintiff," the opening of a Title VII class "can be controlled by complainants who filed earlier than the date on which the class representative filed." *McDonald v. United Air Lines, Inc.*, 587 F.2d 357, 361 n. 11 (7th Cir.1978); *Allen v. Isaac*, 99 F.R.D. 45, 50 (N.D.Ill.1983).

Thus, the law provides that named plaintiff Kem's complaint properly serves as the reference for the opening of the plaintiff class. Equity supports this decision as well. Were a different rule to apply to this case, plaintiff Toura Kem herself could not be a member of the class.

As mentioned above, plaintiff Kem began the grievance procedure in November, 1974, while plaintiff Hartman filed her charge in March, 1977. Ms. Kem filed a lawsuit on April 28, 1977, and moved to consolidate her action with Ms. Hartman's on October 25, 1978. If defendant's interpretation of the law is correct, and anyone who experienced discrimination more than thirty days before Ms. Hartman filed her administrative complaint is excluded from the plaintiff class, clearly plaintiff Kem could not recover. Equity demands a different result.

Exclusion of Ms. Kem from the plaintiff class on the grounds of a time bar is a concept relatively new to this suit. In fact, in his Opposition to Ms. Kem's motion to consolidate, defendant noted that Ms. Kem "potentially qualified" as a member of the class. *Response to Motion to Consolidate*, at 2. Defendant suggested only that Ms. Kem's claim raised substantive issues different from those raised by Ms. Hartman's case; he never once hinted at the possibility that consolidation of Ms. Kem's claim was inappropriate because hers was temporally distant from the Hartman administrative charge.

On November 22, 1978, the Court consolidated Ms. Kem's claim with the suit filed

by Carolee Brady Hartman. Nearly nine years later, it is more than a little late for defendant to raise a statute of limitations question that suggests consolidation was inappropriate for a reason never before brought to the Court's attention. *See, e.g.,* 5 *Federal Practice and Procedure:* Civil § 1278.

In sum, there is no basis in law or equity on which to ignore the administrative claim filed by named plaintiff Toura Kem as the proper basis for determining the opening date of the plaintiff class. Accordingly, the Court finds that the plaintiff class will open on October 8, 1974, thirty days prior to Ms. Kem's invocation of the mandatory grievance procedure.

B. *The plaintiff class closes on November 16, 1984.*

The parties agree that the plaintiff class should close on November 16, 1984, the date of the Court's determination of defendant's liability in this case. *See Plaintiff's Post-Trial Brief* at 8–9; *Defendant's Post-Trial Brief* at 2. The Court agrees that the law, and the evidence adduced at trial, supports closing the class on this date and will therefore order that the plaintiff class closes on November 16, 1984. *See, e.g., Harrison v. Lewis,* 559 F.Supp. at 946.

IV. EXCEPT FOR FOREIGN SERVICE APPLICANTS, CLASS MEMBERS WHO WISH TO PARTICIPATE IN CLASS RELIEF ARE ENTITLED TO INDIVIDUALIZED DETERMINATIONS OF THEIR CLAIMS.

A. *The large majority of class members has not been identified.*

The parties agree, and the evidence adduced at trial demonstrates, that defendant has not maintained a complete list or file of job applicants from which the names of all potential members of the plaintiff class can be culled.[10] *See Transcript* at 218–22 (Testimony of Patricia Howell Hoxie, Chief, Domestic Personnel Division, United States Information Agency) ("Hoxie Testimony"); *id.* at 264–66 (Testimony of Johnnie Otto Manzo, Chief, Operations Division, Voice of America) ("Manzo Testimony"). In fact, the evidence suggests that until the Court's November, 1984, finding of liability against defendant, or even until a few months thereafter, defendant had a policy of destroying employment applications that were more than two years old. *Id.* at 219, 222 (Hoxie Testimony); 264 (Manzo Testimony).[11]

The testimony of defendant's expert Bliss Cartwright, as well as testimony provided by Ms. Hoxie and Ms. Manzo, shows that defendant has maintained partial applicant information for 1983 and nearly complete applicant information for 1984. *Transcript* at 281–82 (Cartwright Testimony); *see also, id.* at 219–220 (Hoxie Testimony); *id.* at 265 (Manzo Testimony). These records will help identify some potential members of the plaintiff class.

■ But it is evident that these files, which cover at most two of the ten years relevant to this case, do not provide a basis for identifying the large majority of the plaintiff class. In order to identify as many members of the plaintiff class as is reasonably practicable, a broad-based approach to notifying potential class members is necessary. *See* Fed.R.Civ.P. 23(d).; *see also, e.g., Segar v. Smith,* 28 Empl. Prac.Dec. ¶ 32,588 (D.D.C.1982). As the

---

**10.** The Court notes at this point that the procedure for notifying class members who were Foreign Service applicants will be different from the procedure set forth in Section IV of this Opinion. That procedure is described *infra,* at Section V.

**11.** The Court will not conclude, as plaintiffs ask, that this destruction of records demonstrates bad faith or a deliberate attempt by defendant to prevent identification of class members. First, the agency destroyed these documents in accordance with OPM regulations. *Transcript,*

at 264 (Manzo Testimony). Moreover, given the Court's original finding in defendant's favor, the Court cannot fault defendant for discarding records it had reason to think irrelevant to court proceedings. While it appears that some employment applications may have been destroyed after the Court's November, 1984, finding of liability, *see* Pl.Ex. 247 (Memo from Rosacker to Davis, Kincaid, and Twardowski re *Hartman v. Wick*), the evidence is far from conclusive on this point.

Court has already found defendant liable, defendant must bear the full expense of this notification task. *See, e.g.,* H. Newberg, *Newberg on Class Actions* § 8.22 (1985 and Supp. April, 1987); *see also, Mills v. Electric Auto–Lite Company,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Segar v. Smith,* 28 Empl.Prac.Dec. ¶ 32,588.

B. *Notice will be mailed to identified class members and, because of the large number of unidentified class members, notice by posting, publication, and memoranda will also be ordered. In addition, plaintiffs will be permitted to conduct limited discovery in order to identify additional class members who may have been encouraged to apply for the jobs at issue by word-of-mouth recruitment.*

As defendant has maintained applicant information for some years at issue, *Transcript* at 281–82 (Cartwright Testimony), defendant will be ordered to send notice by certified mail to all female applicants for the relevant job categories who can be identified by a search through defendant's files. *See, e.g., Laffey v. Northwest Airlines,* 572 F.Supp. 354 (D.D.C.1983), *appealed on other grounds,* 746 F.2d 4 (D.C. Cir.1984), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). As notice by mail is not a practicable method for reaching the vast majority of the plaintiff class, defendant will also have to provide notice through wider-reaching channels.

Defendant agrees that the class notice must be published in the largest newspaper in each of the eighteen largest Standard Metropolitan Statistical Areas ("SMSA"s) in the country.[12] *Defendant's Post–Trial Reply Brief,* at 5–6. The Court agrees that

these measures are necessary and proper methods for notifying potential class members. *See, e.g., Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 167, 94 S.Ct. 2140, 2147, 40 L.Ed.2d 732 (1974); *In re National Student Marketing Litigation v. The Barnes Plaintiffs,* 530 F.2d 1012, 1014 (D.C.Cir.1976) (newspaper publication); *Luevano v. Campbell,* 93 F.R.D. 68, 76 (D.D.C.1981) (same); *Freeman v. Motor Convoy, Inc.,* 68 F.R.D. 196 (N.D.Ga.1974) (posting in defendant's offices).

■ The Court does not agree, however, that the limited publication suggested by defendant is notice reasonably calculated to reach as many members of the plaintiff class as is reasonably practicable. For one, class members may not read the newspaper of largest circulation; although the *New York Daily News* has a larger circulation than the *New York Times,*[13] USIA itself often advertises job openings in the *Times* rather than the *Daily News. See* Pl.Ex. 247 (Aug. 30, 1985, Memo to Nierenberg from Rosacker). This suggests that USIA expects its recruits to read the less widely circulated paper.

At trial, plaintiffs introduced into evidence a USIA memorandum that contained a list of newspapers and other publications in which the Agency had advertised job openings during the period at issue in this suit. *See* Pl.Ex. 210. As the agency believed that those publications were appropriate recruitment tools, it is reasonable to infer that applicants for employment at USIA, among them members of the plaintiff class, read those publications. Given the unrebutted showing that these publications were used to advertise for the very jobs at issue in this suit, the fact that this

12. As of June 30, 1986, the eighteen largest SMSAs are as follows: New York–Northern New Jersey–Long Island–Connecticut; Los Angeles–Anaheim–Riverside; Chicago–Gary–Lake County; San Francisco–Oakland–San Jose; Philadelphia–Wilmington–Trenton; Detroit–Ann Arbor; Boston–Lawrence–Salem–Lowell–Brockton; Houston–Galveston–Brazoria; Dallas–Fort Worth; Washington, D.C.; Miami–Fort Lauderdale; Cleveland–Akron–Lorain; Atlanta; St. Louis; Pittsburgh–Beaver Valley; Minneapolis–St. Paul; Baltimore; Seattle–Tacoma. United States Department of Commerce, Bureau of the

Census, *USA Statistics in Brief: A Statistical Abstract Supplement* (1987).

13. As of September 1, 1987, the weekday circulation of the *New York Times* was 1,056,924 copies per day. The *New York Daily News* weekday circulation was 1,278,118 copies per day. The *Times,* however, does have a slightly higher Sunday circulation, 1,645,060 copies to the *Daily News's* 1,631,688. D. Snider, *Standard Rate and Date of Service: Newspaper Rate and Data,* 544, 549 (Sept.1987).

suit involves an applicant class, and the likelihood that readers of the publications include at least some members of the plaintiff class, the Court will order publication of the class notice in these journals and newspapers as well. *See Luevano v. Campbell*, 93 F.R.D. at 76–77 (Court may order publication of class notice in journals and newspapers with readership likely to include class members).

One remaining question is the frequency with which these notices should be published. *Luevano v. Campbell*, 93 F.R.D. 68 (D.D.C.1981) is instructive on this point. As in the instant case, in *Luevano* the government had not maintained records from which most class members could be identified. *Id.* at 76. Judge Joyce Hens Green of this Court therefore ordered that defendants publish the class notice once per week for four weeks in 117 newspapers and magazines. *Id.*

Although the potential class in *Luevano* was significantly larger than plaintiffs' estimate of the potential size of the plaintiff class in this case, *see id.* at 75, the Court believes that newspaper publication once a week for four weeks, including publication on at least one Sunday in each paper with a Sunday edition, is a reasonable method of attempting to reach as many members of the plaintiff class as possible. Publication should begin in the middle of one month, and continue for four weeks, so that any class members who may be out of town during the period of publication will not be prejudiced. The Court believes that publication in four issues of the journals and magazines listed on Plaintiffs' Exhibit 210 is warranted as well. The Court will therefore order defendant to undertake such publication and to provide plaintiff with proof of each publication ordered. Notice must, of course, be of a physical size, appearance, and location within the publication calculated to attract the reader's attention.

Although mailed and published notices are reasonably calculated to reach large segments of the plaintiff class, other efforts to identify class members are warranted as well. Because the evidence sug-

gests that applicants for the jobs at issue in this suit may continue to apply for government employment, *see Transcript* at 425 (Testimony of Stephan Michelson, President, Longbranch Research Associates) ("Michelson Testimony"), notice should be posted in government employment offices. *See, e.g., Luevano v. Campbell*, 93 F.R.D. at 77. Defendant agrees that it should be required to post a copy of the class notice in all USIA personnel offices and at the Office of Personnel Management. *See Defendant's Post–Trial Reply Brief*, at 5–6. The Court believes that these measures are necessary and proper attempts to notify the maximum possible number of potential class members and will order such postings.

The Court also believes that notice must be posted at all regional OPM offices as well. As the evidence shows that defendant sometimes recruits on a "government-wide" basis, *Transcript* at 196 (Hoxie Testimony), it is not unlikely that some members of the plaintiff class will be among those who check OPM regional offices for vacancy announcements and other information.

Plaintiffs ask, in addition to posted notice, that defendant be ordered to give copies of the class notice to new applicants for jobs at the agency. This proposal is reasonable in light of defendant's contention that some rejected applicants reapply to the agency. *See supra* Section II C. Consequently, the Court will order that, throughout the period in which claims may be brought, defendant provide class notice to all women who apply for jobs with defendant agency.

The evidence points to additional areas in which distribution of class notice would likely lead to identification of class members. The evidence shows that, at least in recent times, defendant tailored some of its recruitment toward agency employees. *See id.* at 196–98 (Hoxie Testimony). Moreover, agency personnel apparently encouraged women who were potentially qualified for the positions at issue to apply for lower-level jobs within the Agency, in-

cluding clerical positions, so that they might in future be eligible for promotion to the job categories at issue in this suit. *Id.* at 198. In addition, testimony revealed that some "purchase order vendors" (*i.e.,* contract providers of USIA services) applied or were recruited for the positions in which the Court found defendant liable for sex discrimination. *Id.* at 196 (Hoxie Testimony), 254–55 (Manzo Testimony).

On the basis of these facts, the Court finds that defendant must send class notice, via certified mail, to each and every current female employee and purchase order vendor. Defendant must also search whatever files it maintains on prior employees and purchase order vendors in order to identify any previous female employees or purchase order vendors who unsuccessfully applied for employment within the relevant job categories during the time period relevant to this suit. Defendant must send notice by certified mail to any additional applicants revealed through this search.

Plaintiffs have asked, in addition to these procedures, to take limited discovery of agency officials in order to identify potential class members who were orally encouraged to apply—or discouraged from applying—for the relevant positions. In light of the unrebutted evidence that defendant recruits many employees by word-of-mouth and through other informal channels, *see Transcript* at 258–67 (Manzo Testimony), plaintiff will be permitted to submit interrogatories and requests for production of documents to USIA and VOA selecting officials, and to conduct depositions of these officials. Any such discovery must be designed only to facilitate identification of these potential members of the plaintiff class. *See, e.g., Johnson v. American Airlines, Inc.,* 531 F.Supp. 957, 961 (N.D.Tex.1982); *Frank v. Capital Cities Communications, Inc.,* 88 F.R.D. 674 (S.D.N.Y.1981).

In sum, defendant will be ordered to send class notice by certified mail to all identifiable members of the plaintiff class and to publish class notice in a wide variety of print media sources, all of which are reasonably calculated to reach potential members of the plaintiff class. Defendant will also be ordered to post class notice in its personnel offices and to circulate notice among female employees and job applicants. Plaintiffs will be permitted to conduct limited discovery of defendant's selecting officials in order to identify additional members of the plaintiff class who may have been encouraged to submit applications for employment in the relevant job categories. This broad approach to class-wide notice, while by no means ideal, is the best notice possible under the circumstances of this venerable case.

C. *The content of the notice must explain the basic facts about this suit, including the definition of the plaintiff class, the Court's finding of liability, the Court's remedial order, and what potential class members must show in order to be eligible for a determination of defendant's liability to each of them.*

Notice to potential members of the plaintiff class must satisfy due process concerns. *See, e.g., Newberg on Class Actions,* §§ 8.22, 8.32. Thus, it must be "reasonably calculated, under all the circumstances, to apprise" potential members of the plaintiff class "of the ... action and afford them an opportunity to present their [claims].... The notice must be of such nature as reasonably to convey the required information ... and it must afford a reasonable time for those interested to make their appearance." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

Accordingly, the Notice to Potential Class Members must include the following: a description of the nature of this lawsuit; a statement that the Court found defendant liable for sex discrimination against female applicants for certain positions and by job categories within the Agency; a list of the job titles in which the Court found discrimination and a list of any reclassification of those job titles; notice that the case is now in its remedial phase; and a statement that any female who applied for a job in one of the relevant categories during a period from October 8, 1974,

through November 16, 1984, and who was rejected for that position, may be a member of the plaintiff class.

■ The notice must further state that any woman who believes she falls into this category must obtain and submit a "proof of claim" form. The notice must state that these forms are available from *plaintiffs' counsel* and the USIA Personnel Officer, as well as USIA and OPM employment offices. The notice must also state that proof-of-claim forms must be returned to plaintiffs' counsel within sixty days of the date on which the notice was sent or published. The notice must inform potential plaintiffs that neither the Court nor its Clerk will accept proof-of-claim forms or forward them to plaintiff's counsel.

■ Finally, the notice must inform potential class members about the process by which individuals can obtain relief. As detailed below, the notice to class members who were not Foreign Service applicants must include a brief and clear description of what each plaintiff will have to prove in order to recover, of the process through which relief will be determined, and of the possible forms that relief might take. Because the relief to be afforded to Foreign Service applicants is different from the relief available to other members of the plaintiff class, those claimants must receive a different notice form, which must clearly and simply explain this suit, the Court's finding of liability, which Foreign Service applicants are eligible for relief in this suit, the nature of the relief available to them, and the steps that claimants must take next.

The parties have submitted proposed Notices, but neither proposal fully encompasses these points. Accordingly, the Court will order the parties to confer and develop a class notice consistent with this Opinion and submit this proposed Notice to the Court within sixty days of the date of the Order that will accompany this Opinion.

D. *The proof-of-claim forms must ask plaintiffs to show that they applied for a job within one of the relevant job categories during the relevant time period and that they were rejected.*

Each woman who believes that she is a member of the plaintiff class must submit a "Proof of Claim" form that provides information about her possible class membership. *See, e.g., Harrison v. Lewis*, 559 F.Supp. 943, 946 (D.D.C.1983). The parties agree that the form must ask each potential class member to identify the position sought, when she applied for the position, and a statement that her application was rejected. *See Plaintiffs' Post–Trial Brief* at 29; *Defendant's Post–Trial Reply Brief* at 1. The Court agrees that the Proof of Claim form must request this information in straightforward terms that do not deter potential class members from submitting a form. The form must also, however, inform potential class members that they will have the burden of proving these facts at the hearing on their individualized claims.

Plaintiffs suggest that the form also ask each respondent to state her name, address, telephone number, and whether she currently wishes to be considered for a position at USIA. The Court agrees that these questions should be included on the form, and it will order that the form include them.

■ Defendant has argued strenuously and consistently that each class member must prove that she was "minimally qualified" for the job for which she applied and that the proof-of-claim form must ask potential class members to show these minimal qualifications.[14] In light of the previous finding of liability, defendant is incorrect.

To be sure, prior to a finding of liability, a plaintiff bears the burden of proof on all issues, including the burden of showing qualification for the job sought. *See, e.g., Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). But once "the employer is a proven discriminator," *McKenzie v.*

**14.** By "minimal qualifications" defendant means the minimal qualifications "determined

pursuant to Office of Personnel Management Standards." *Defendant's Post–Trial Brief,* at 2–3.

*Sawyer,* 684 F.2d 62, 77 (D.C.Cir.1982), there is a *presumption* that its actions against alleged victims of that discrimination were illegal. *Id.*

On November 16, 1984, the Court found that defendant had discriminated against women who applied for employment in six broad job categories. As the Supreme Court has put it, in class-wide suits such as this one,

> individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage of the trial.... *The [plaintiffs] need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proven discrimination.* As in *Franks [v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976)], *the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.*

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 361–62, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396 (1977) (emphasis added); *see also, McKenzie v. Sawyer,* 684 F.2d 62, 77 (D.C.Cir.1982); *Harrison v. Lewis,* 559 F.Supp. 943, 946 (D.D.C. 1983); *Chewning v. Schlesinger,* 471 F.Supp. 767, 770 (D.D.C.1979). Thus, the proof-of-claim forms for this case may not, and will not, require potential members of the plaintiff class to show or prove their minimum qualifications for the job or jobs for which they applied.

The proposed proof-of-claim form submitted by plaintiffs largely satisfies the requirements set forth in this Opinion and the accompanying Order. The Court will order the parties to confer to develop an amended form that encompasses all requirements set forth herein and to submit the amended form for the Court's approval when they resubmit the proposed class notice.

The Court will order plaintiffs' counsel to send a copy of the Court-approved proof-of-claim form to each and every respondent to the class notice within ten days after receiving such response. Plaintiffs' counsel will be entitled to reimbursement from defendant for the mailing costs. In addition, the Court will order defendant to make these forms available at all USIA and OPM national and regional personnel offices so that potential class members who see the posted class notice can obtain a proof-of-claim form in the personnel offices as well.

E. *The claims of class members who were not Foreign Service applicants will be determined through individual Teamster hearings unless the parties can agree on an alternative procedure.*

 A decision that an employer has violated Title VII with respect to the rights of an entire class does not, of course, automatically entitle each member of that class to relief. *See, e.g., McKenzie v. Sawyer,* 684 F.2d at 75. Rather, unless the defendant's actions were egregious and pervasive, the finding of discrimination only creates a presumption that each class member is entitled to an individualized hearing at which his or her particular claim to relief can be assessed. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 372, 97 S.Ct. 1843, 1873, 52 L.Ed.2d 396 (1977) (following a determination of liability to a plaintiff class, individual class members are entitled to a case-by-case determination of their claims). *Id.* at 372, 97 S.Ct. at 1873; *compare Segar v. Smith,* 738 F.2d 1249, 1290 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985) (hearings not required "when discrimination has so percolated through an employment system that any attempt to reconstruct individual employment histories would drag the court into 'a quagmire of hypothetical judgments' ").

The parties agree that individual hearings, known colloquially as "Teamster hearings," are appropriate for most class members in this case. The Court agrees that, unless the parties can agree on an alternative format, it must order these unwieldy hearings. But because the Court is aware of the enormous disruption these hearings can cause counsel and the Court

or its designee, as well as the enormous dedication of resources the hearings require, the Court believes that the interests of justice would best be served if individualized hearings could be avoided. Consequently, the Court will order the parties to consider the relief ordered in *Thompson v. Boyle*, 499 F.Supp. 1147 (D.D.C.1979), *aff'd*, 678 F.2d 257 (D.C.Cir.1982), to confer about the possibility of similar relief in this case, and to inform the Court within thirty days of the date of the Order accompanying this Opinion if some *Thompson*-like resolution of this case is possible. The Court will, however, order *Teamster* hearings, but will vacate this portion of the Opinion and accompanying Order if the parties can agree upon *Thompson*-type relief. The Court will nonetheless outline the method by which *Teamster* hearings will be conducted and the relief available through them.

F. *The Court will determine whether Teamster hearings should be conducted by a United States Magistrate or by one or more Special Masters once class members have submitted proof of claim forms.*

The parties and the Court agree that, given the press of the Court's business, the Court itself should not conduct the *Teamster* hearings. As plaintiffs argue that the number of positive respondents to the class notice will likely be too large for one individual to manage, they ask the Court to appoint several special masters pursuant to Fed.R.Civ.P. 53(a). Defendant counters that the number of positive respondents who will require *Teamster* hearings will be relatively small and within the managerial competence of a single United States Magistrate. Defendant therefore asks the Court to appoint a Magistrate to conduct the hearings pursuant to Rule 53(a) and 28 U.S.C. § 636(b)(2). The Court does not now have sufficient information to decide this matter.

As noted above, there is no precise way in which to determine class size. From the evidence adduced by defendant at trial, it appears that the plaintiff class for five of the six occupational categories in which the Court originally found liability[15] probably exceeds 4,400 members.[16] This figure excludes foreign service applicants; moreover, it includes only class members who were minimally qualified for the jobs for which they applied. Because plaintiffs do not bear the burden of showing that they are minimally qualified, *see infra* at 335–336, this estimate is almost certainly too low.

Thus, if even one-fifth of these class members responded positively to the class notice, the task of conducting individualized hearings would exceed the management capacity of one individual. Neither

**15.** Because the claims of foreign service officer applicants will be determined by a different procedure, the number of foreign service applicants is irrelevant for purposes of calculating the size of the class that will be entitled to individualized hearings.

**16.** The derivation of this number is simple. Defendant showed that in 1984 and 1985, 868 women applied for positions in five of the six occupational categories at issue in this suit, were minimally qualified, and were not hired. *See* Def.Ex. 14 (Longbranch Research Associates, Minimally Qualified Applicants). The Court assumes, for the purposes of its calculations, that the 1984–85 figure is representative of the average number of unsuccessful, minimally qualified female applicants for the jobs at issue in any two-year period. Therefore, the Court divided 868, the number of unsuccessful applicants for the five job categories in 1984–1985, by 2 to arrive at the average number of unsuccessful applicants in each of 1984 and 1985 (434 applicants each year). The Court then multiplied this number by 8 to estimate the number of applicants from 1975 through 1983 (3,472 applicants). As the class opened on October 7, 1974, the Court had to estimate the number of applicants during the months of November and December and from October 7 through October 30, 1974 as well. To do so, the Court divided 434, the average number of applicants per year, by 12 to obtain the average number of unsuccessful applicants per month (36). Thus, in November and December, 1974, there were an estimated 72 unsuccessful applicants. The Court next divided that number by 61, the number of days during that period, to estimate the number of unsuccessful applicants per day in October, 1974 (1.2), and multiplied that number by 24 to estimate the number of unsuccessful applicants from October 7, 1974, when the class opened, through the end of that month (29 applicants). The sum of these numbers is 4,441, the most accurate estimate of the size of the non-foreign service component of the plaintiff class at which the Court can now arrive.

the Court nor the parties, however, can now estimate whether one-fifth, four-fifths, or a very small number of class members will see and respond to the class notice. Although Joseph M. Sellers, director of the Legal Employment Opportunity Program at the Washington Lawyers' Committee for Civil Rights Under Law, testified that, in his experience, a large percentage of known class members tend to respond positively to class notice, *Transcript* at 64–66, he did not testify as to the percentage of likely respondents when most class members have *not* been identified. Thus, Mr. Sellers' testimony, while generally illuminating, shed no light on this specific problem.

The Court must therefore conclude that, on the basis of the facts before it, it cannot estimate the number of positive respondents to the class notice with anything remotely approaching precision. Accordingly, it will reserve decision on whether the *Teamster* hearings should be conducted by a United States Magistrate or by one or more Special Masters. As the Court has ordered that the proof of claim forms be sent to plaintiffs' counsel, the Court will also order that plaintiffs' counsel inform the Court, within thirty days after the last day on which the class notice was published, of the number of positive respondents to the notice. On the basis of that information, the Court will determine whether one Magistrate is capable of conducting the individualized hearings that must be afforded to members of the plaintiff class or whether it must appoint a panel of Special Masters to conduct those hearings.

G. *Burden of Proof at the Teamster Hearings.*

 Each claimaint who is entitled to an individualized hearing must show, by a preponderance of the evidence, that she applied for a job in one of the relevant categories at some time between October 8, 1974, and November 16, 1984, and was rejected. At that point, she will have the benefit of the presumption of discrimination that results from the Court's finding of defendant's liability toward the plaintiff class. *See, e.g., International Brother-* *hood of Teamsters v. United States*, 431 U.S. at 362, 97 S.Ct. at 1868; *Harrison v. Lewis*, 559 F.Supp. 943, 946 (D.D.C.1983).

Defendant will be able to overcome this presumption of discrimination if he can prove, by clear and convincing evidence, that he had a legitimate, non-discriminatory reason for rejecting the claimant's employment application. *See, e.g., Trout v. Lehman*, 702 F.2d 1094, 1107 (D.C.Cir.1983), *vacated on other grounds*, 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984); *McKenzie v. Sawyer*, 684 F.2d at 78; *Harrison v. Lewis*, 559 F.Supp. at 946–47. If defendant meets this burden, the claimant must be allowed to offer evidence showing that defendant's alleged non-discriminatory reason for rejecting the claimant's application was merely a pretext for unlawful discrimination. *See, e.g., International Brotherhood of Teamsters v. United States*, 431 U.S. at 362, 97 S.Ct. at 1868; *Harrison v. Lewis*, 559 F.Supp. at 946.

 The Court must add one point about the way in which evidence must be weighed during these hearings. Because it is impossible to recreate the process that led to rejection of a plaintiff's employment application, "all doubt must be resolved 'against the proven discriminator rather than the innocent [applicant].'" *Id.* at 947, *quoting McKenzie v. Sawyer*, 684 F.2d at 77. Thus, if there is any uncertainty about the actual reason that defendant rejected a claimant's employment application, that doubt must be resolved against the defendant.

V. **REMEDIES FOR SUCCESSFUL INDIVIDUAL CLAIMANTS WHO WERE NOT FOREIGN SERVICE APPLICANTS.**

 Those claimants who prevail during the *Teamster* hearings are entitled to relief designed to make them whole "for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). To provide full make-whole relief under Title VII, "a court must, as nearly as possible, 'recreate the conditions and relationships

that would have been had there been no' unlawful discrimination." *International Brotherhood of Teamsters v. United States*, 431 U.S. at 372, 97 S.Ct. at 1873, *quoting Franks v. Bowman Transportation Co.*, 424 U.S. 747, 769, 96 S.Ct. 1251, 1266, 47 L.Ed.2d 444 (1976). To do so, the Court must, as in any equitable proceeding, "draw on the 'qualities of mercy and practicality that have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.'" *Teamsters*, 431 U.S. at 375, 97 S.Ct. at 1875, *quoting Hecht Co. v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944).

### A. *Plaintiffs are entitled to back pay.*

■■■ There is no dispute that, because back pay is fundamental to remedying most forms of employment discrimination, *see, e.g., Albemarle Paper Co. v. Moody*, 422 U.S. at 421, 95 S.Ct. at 2373, successful claimants must be awarded back pay. In keeping with the remedial, make-whole purpose of back pay, the cut-off date of each back pay award will be the day on which the award is approved for the particular claimant. *See, e.g., Equal Employment Opportunity Commission v. Enterprise Association Steamfitters*, 542 F.2d 579, 590 (2d Cir.1976), *cert. denied sub nom. Rios v. Enterprise Association Steamfitters*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977).

■■ The parties do not agree on the method for calculating the back pay awards. Plaintiffs suggest construction of a "proxy salary" based on the earnings of persons actually hired for the job in question and still employed by the agency. *Plaintiffs' Post–Trial Brief* at 32. Defendant, in contrast, believes that back pay should be based on "established salary schedules." *Defendant's Post–Trial Reply Brief* at 9–10. Because equity favors the use of proxy salaries, the Court will order that monetary awards be based on hypothetical salary histories.

Since remedies for this plaintiff class must be designed to make plaintiffs financially whole, any back pay award must attempt to place each plaintiff in the monetary position she would have occupied absent discrimination. This need not, and most often cannot, be calculated with exactitude; as long as the award is a just and reasonable estimation of what a plaintiff would have received but for the discrimination, it passes this equitable muster. *See, e.g., Segar v. Smith*, 738 F.2d 1249, 1290 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260 (5th Cir.1974).

It would be difficult to fashion the make-whole relief demanded under Title VII if back pay awards were based on government salary schedules. For one, plaintiffs' awards should reflect salary increases from promotions that would have been likely had they been selected for the position at issue. *See, e.g., Murray v. Weinberger*, 741 F.2d 1423, 1425 (D.C.Cir.1984); *Day v. Mathews*, 530 F.2d 1083, 1085 (D.C.Cir. 1976) (per curiam). Whether such promotions would have occurred, when they would have occurred, and how many times they would have occurred would be pure uninformed speculation if the back pay award were based on a salary schedule.

In contrast, if the award were based on a proxy salary constructed from the actual histories of the selectees who remain in agency employ, the Court could gauge the expected frequency and level of promotion more accurately. The unrebutted evidence at trial showed that, in adopting a proxy salary, at least one court explicitly rejected the use of established salary schedules as "considerably more onerous and complicated than following the careers of the selectees and the salaries they earned over a period of time." *Transcript*, at 68–69 (Sellers testimony).

Although the Court is not convinced of the claimed simplicity of the proxy schedules, it fully appreciates the complications that would follow if back pay awards were based on government salary schedules. Not only would the Master or Magistrate have to guess about promotions, overtime, and other non-standardized elements of compensation, he or she would have to

make a separate calculation of the monetary award due each claimant. In contrast, construction of proxy salary schedules would allow the Master or Magistrate to make calculations for each job, rather than for each applicant.

Because equity and efficiency favor use of the proxy salary, the Court will order that back pay awards be calculated with reference to a representative salary determined for each position at issue. This salary will be based on the average salaries actually paid to persons currently employed by the agency who were hired into positions similar to the one that the class member would have filled absent discrimination. The proxy salary will be calculated for each year, so that the Master or Magistrate will not have to engage in a multitude of individualized calculations.

■ In addition to back salary, victims of discrimination are entitled to the monetary value of fringe benefits in their back pay awards. *See, e.g., Crabtree v. Baptist Hospital of Gadsen, Inc.*, 749 F.2d 1501 (11th Cir.1985); *Snead v. Harris*, 23 Empl.Prac.Dec. ¶ 30,927 (D.D.C.1980) [Available on WESTLAW, 1980 WL 144]. Among the fringe benefits whose monetary value could be included in the back pay award are vacation leave, sick leave, and medical coverage. *See, e.g., Moysey v. Andrus*, 22 Empl.Prac.Dec. ¶ 30,834 (D.D.C. 1980) [Available on WESTLAW, 1980 WL 122]. Similarly, back pay awards must include the value of overtime and shift differentials, if the successful plaintiff would have been eligible for these salary incentives had she been awarded the job at issue. *Id.* The Master or Magistrate will be responsible for determining what fringe benefits should be added to the back salary calculation, how to value those fringe benefits, whether the plaintiff is entitled to the monetary value of overtime or shift differentials in her award and, if so, what that value should be.

B. *Plaintiffs who request employment with the Agency but cannot be hired immediately are eligible for front pay as well.*

■ Front pay "compensates plaintiffs ... for the fact that the wrongs for which they are entitled to receive back pay cannot be righted without delay." *Thompson v. Sawyer*, 678 F.2d 257, 292 (D.C.Cir.1982). It is possible that defendant cannot immediately provide every claimant who requests and is eligible for agency employment a job comparable to the one that she would have occupied absent discrimination. If so, the claimant is eligible for "front pay" in addition to her back pay award. *See, e.g., id.* at 290.

Front pay must be calculated according to the formula used to determine the back pay awards. *Id.* at 292. Because front pay should "be cut off when the wrong has ended," *id.* at 293, the Court will order the Master or Magistrate to provide front pay, if appropriate, either until the claimant receives an appropriate position with the agency or until a date certain, based on an estimate of the period it should take the individual to find employment, the claimant's work expectancy, and her life expectancy. *See, e.g., Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 956–58 (10th Cir.1980).

C. *Class members were obligated to make reasonable efforts to mitigate damages, and the monetary awards must be reduced by the mitigating earnings.*

■ Title VII mandates that "back pay otherwise allowable" be reduced by "[i]nterim earnings or amounts earnable with reasonable diligence by the person ... discriminated against." 42 U.S.C. § 2000e–5(g). Thus, the Court must order that all back pay awards be reduced by amounts that claimants earned or could have earned "with reasonable diligence." *See, e.g., Ford Motor Co. v. Equal Employment Opportunity Commission*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed. 2d 721 (1982); *Clark v. Marsh*, 665 F.2d 1168, 1172 (D.C.Cir.1981).

■ Plaintiffs are not, however, required to mitigate damages by accepting employment beneath their skills. *See, e.g., Ford Motor Co. v. EEOC*, 458 U.S. at 231–32, 102 S.Ct. at 3065; *Graham v.*

*Adams,* 640 F.Supp. 535, 541–42 (D.D.C. 1986). What a plaintiff must show, and what will be imputed to each plaintiff, is a reasonable effort to find a position "substantially equivalent" to the one denied her, and the reasonableness of that effort will depend upon the individual characteristics of the plaintiff, the type of job, and the job market. *See, e.g., Rasimas v. Michigan Department of Mental Health,* 714 F.2d 614, 624 (6th Cir.1983), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984).

 Once the Master or Magistrate finds that a claimaint is entitled to a make-whole monetary award, and plaintiff has presented evidence on damages, the defendant has the burden of producing evidence to show interim earnings or lack of diligence. *Id.; see also, Marks v. Prattco, Inc.,* 633 F.2d 1122, 1125 (5th Cir.1981) (per curiam); *Sangster v. United Airlines, Inc.,* 633 F.2d 864, 868 (9th Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981); *United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 937 (10th Cir.1979); *Taylor v. Philips Industries, Inc.,* 593 F.2d 783, 787 (7th Cir.1979). To do so, defendant must show that a substantially equivalent position was available and that the claimant either turned down or failed to exercise reasonable diligence to find such a position. *Rasimas v. Michigan Department of Mental Health,* 714 F.2d at 624.[17]

D. *Plaintiffs who request positions with the Agency are eligible for hiring priorities and retroactive promotions.*

 Because Title VII "requires that persons aggrieved by the consequences and effects of the unlawful employment prac-

tice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination," *Franks v. Bowman Transportation Co.,* 424 U.S. at 764, 96 S.Ct. at 1264, members of the plaintiff class who are entitled to relief are also entitled to hiring priorities and retroactive appointment. *See, e.g., Local 28, Sheet Metal Workers v. Equal Employment Opportunity Commission,* 478 U.S. 421, 106 S.Ct. 3019, 3049, 92 L.Ed.2d 344 (1986) (retroactive appointment); *Franks v. Bowman,* 424 U.S. at 770–80, 96 S.Ct. at 1267–71 (hiring priorities); *Harrison v. Lewis,* 630 F.Supp. 212, 215 (D.D.C. 1986).

Accordingly, the Agency will be ordered to offer a hiring priority to any class member who is eligible for relief and who currently requests a position with the Agency. Her appointment date will be retroactive to the date on which she would have been hired absent the discrimination, thereby ensuring that the relief afforded to that plaintiff compensates for the differences in seniority that would ordinarily have resulted from defendant's discriminatory actions.

## VI. RELIEF FOR FOREIGN SERVICE APPLICANTS TO THE UNITED STATES INFORMATION AGENCY.

A. *The Court will model the relief for Foreign Service applicants to the United States Information Agency on the consent decree in Palmer v. Shultz.*

As detailed above, among those entitled to relief are women who unsuccessfully applied for Foreign Service positions within the United States Information Agency during the period relevant to this suit. Plaintiffs maintain, and the Court agrees, that, the remedy for these class members must

---

**17.** Plaintiffs maintain that unemployment compensation is not deductible from a back pay award. *See Plaintiffs' Post–Trial Brief,* at 37. The Court is puzzled about the relevance of unemployment compensation to the discrimination at issue in this case. Because the plaintiff class is an *applicant* class, and unemployment compensation is provided only when employment is terminated, plaintiffs would not have been eligible for unemployment compensation as a result of defendant's actions. The Court realizes that some plaintiffs may have been dis-

criminatorily denied employment with the defendant agency while they were receiving unemployment insurance payments as a result of an *earlier* job termination. Those payments are not deductible from any back pay award. *See National Labor Relations Board v. Gullett Gin,* 340 U.S. 361, 364, 71 S.Ct. 337, 339–40, 95 L.Ed. 337 (1950). The Court does not now decide, of course, that unemployment compensation received by a Title VII claimant *as a result of a discriminatory termination* is exempt from the general mitigation requirement.

be tailored to the special process by which Foreign Service officers are hired.[18] The Court believes that the remedy for Foreign Service applicants must be designed to ensure that those women most likely to merit appointment as Foreign Service officers achieve that goal within a reasonable time and with no more than a reasonable cost and burden upon defendant.

At trial, Frontiss B. Wiggins, the State Department official charged with implementing the consent decree in *Palmer v. Shultz*, a sex discrimination suit brought against the Department of State, testified that the consent decree established a workable and extremely successful process for reevaluating and hiring women who had been previously rejected for Foreign Service positions at the Department of State. *Transcript*, at 81–85; *see also*, Pl.Ex. 217 ("Fifth Report of the Board of Examiners for the Foreign Service"), 233 (Memo from Robinson to Hackett re ICA Practice in Selection of Minority Junior Foreign Service Officers). As such, the consent decree in *Palmer v. Shultz* points toward an appropriate remedy for Foreign Service applicants who are members of the plaintiff class in this suit.

The *Palmer* method forces the Foreign Service examiners to reevaluate the most promising of unsuccessful female applicants to the Foreign Service. In *Palmer*, the State Department obtained Foreign Service written examination scores for rejected female applicants throughout the relevant time period. *Transcript*, at 80–81. The Department then offered women with the highest written scores an opportunity to participate again in the Oral Assessment part of the Foreign Service Officer selection procedure. *Id.* at 80. Those class members who chose to participate were evaluated alongside all other Foreign Service candidates. *Id.* at 106; *see also*, Pl.Ex. 204 (*Palmer* consent decree). Class members who succeeded in the Oral Assessment phase were then subjected to the medical and security checks through which all Foreign Service candidates must go. *Transcript* at 106; Pl.Ex. 204.

Class members who survived these screenings were evaluated separately from "regular" Foreign Service applicants in the last stage of review. Applications of *Palmer* class members who survived to this stage of the reexamination process were there evaluated *only* with respect to the application of other *Palmer* class members. The reviewing panel was specifically instructed that background and Oral Assessment performance should be particularly important in this final review. *Id.* The seventy-five top scorers were offered Foreign Service Officer positions. *Transcript* at 91; Pl.Ex. 204.

The unrebutted evidence before the Court reveals that the *Palmer* method efficiently produced Foreign Service Officers who are expected to fare at least as well in their careers as Foreign Service Officers chosen through the usual means. *Transcript* at 82. Accordingly, the Court will base the remedy for Foreign Service applicants to the USIA on the *Palmer* decree.

As in *Palmer*, defendant will be ordered to obtain a list of the names, addresses, and examination scores of women who applied to the Foreign Service between October 8, 1974, and November 16, 1974. Defendant will be ordered to create a rank-order list, for each year at issue, of the women who unsuccessfully applied for Foreign Service Officer positions at USIA or, for the years in which all Foreign Service applicants took one joint examination, a rank-order list of women who failed the USIA "cones" on the Foreign Service exam.

**18.** Foreign Service Officer candidates must take a written examination for the foreign service. If their score is above the passing grade set for a particular agency that employs Foreign Service Officers, they proceed to "Oral Assessment Panels." Candidates who pass muster before those panels must undergo detailed medical and security checks. Once a candidate has survived these various reviews, his or her application, test scores, and background checks are reviewed by a "Final Review Panel." Only if approved by that panel is the candidate eligible for a Foreign Service position in the agency whose section of the written examination they passed. *See* 22 C.F.R. §§ 11.1–11.6 (1987).

As in *Palmer,* defendant will be ordered to invite class members, in descending order of examination scores, to compete alongside current Foreign Service applicants in the Oral Assessment process. This written invitation must also serve as class notice to Foreign Service applicants, and must inform these class members of the nature of the suit, this Court's finding of liability, and the procedures for obtaining relief available to these class members.

Those class members who survive the Oral Assessment would then be subjected to the medical and security checks that successful Foreign Service applicants ordinarily undergo. Again as in *Palmer,* class members who survive those checks would be compared by the Final Review Panel only to other class members, not other Foreign Service candidates.

Defendant will be ordered to create a rank-order list of class members who survive the full Foreign Service assessment process. A number of Foreign Service appointments each year will be made from this special register of eligible Foreign Service Officers. Plaintiffs ask the Court to order that a maximum of twenty-five appointments per year, and a total of seventy-five appointments, be made from this special register.

The Court, however, does not know how many Foreign Service Officers are appointed to USIA each year or whether the agency would argue, and be able to show, that twenty-five appointments per year would be inappropriate. Accordingly, the Court will order the parties to confer with respect to these remedial measures. The Court will also order the parties to submit joint or separate memoranda addressing the agency's ability to process and absorb seventy-five Foreign Service Officers from the plaintiff class over a three-year period. These briefs will be due within sixty days from the date of the Order accompanying this Opinion.

## VII. THE COURT WILL NOT ORDER PROSPECTIVE RELIEF.

■■■ Plaintiffs have asked the Court to order prospective relief to correct allegedly continuing discrimination at the defendant agency. Specifically, plaintiffs ask the Court to order defendants to engage an outside expert to study recruitment and hiring at the agency and to recommend steps necessary to correct any discrimination revealed by those studies. Plaintiffs also ask the Court to impose a hiring goal to increase the representation of women in the Electronics Technician Series (series 856). The Court must deny these requests.

■■■ The Court has broad remedial power to order appropriate affirmative action if the trial record reveals that such prospective relief is necessary to correct continuing discrimination. *See, e.g., Local 28, Sheet Metal Workers Int'l Ass'n v. Equal Employment Opportunity Commission,* 478 U.S. 421, 106 S.Ct. 3019, 3034–50, 92 L.Ed.2d 344 (1986). To that end, the Court must consider both defendant's history of discrimination and whether discrimination has continued after the defendant was made aware of its unlawful behavior. *See, e.g., Berkman v. City of New York,* 812 F.2d 52, 62 (2d Cir.1987). Absent convincing contrary evidence, the Court will not find that defendant continued to discriminate after the illegality of its practices was made clear by the Court's 1984 finding of discrimination. *Id.; see also Firefighters Inst. for Racial Equality v. City of St. Louis,* 616 F.2d 350, 364 (8th Cir.1980), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981).

Plaintiffs' request for propsective relief relies on the testimony of Dr. Bernard R. Siskin, Vice President of National Economic Research Associates, Inc. Dr. Siskin updated the pre–1980 statistical evidence on which the Court relied in its 1984 finding of liability. *Transcript* at 128–37. Dr. Siskin's data reveal that, from 1979 through 1985, there was a statistically significant shortfall in the number of women employed or offered employment in four of the job categories at issue in this suit compared to the number of women potentially available for those jobs in the relevant labor market (*i.e.,* the "availability pool"). *See* Pl.Ex. 190(a), (b); 192(a), (b); 196(a), (b); 197(a), (b); and 236(a), (b).

Plaintiffs maintain that, in light of the finding of liability and the unabated discrimination shown by Dr. Siskin, they are entitled to an inference of continuing discrimination. With respect to defendant's hiring practices, any such presumption is effectively rebutted by the statistical evidence offered by defendant. Looking not at hypothetical availability pools but at actual employment practices at the defendant agency, defendant showed that statistical analysis does not support an inference of discrimination in the frequency with which the agency offers employment to minimally qualified women. *See* Def.Ex. 7, 16–18.

The picture is not as clear with respect to recruitment. As defendant's data examine the treatment afforded to applicants only after they are designated "minimally qualified," the data do not rebut plaintiffs' statistical evidence. But, taken as a whole, the record offers other compelling reasons for denying prospective relief in the recruitment area.

First, the process whereby applicants for certain jobs are designated "minimally qualified" for most jobs at issue is largely objective. *Transcript* at 194–96 (Hoxie testimony). This is less true of the process for candidates to the radio broadcaster job series. *Id.* at 251–59 (Manzo testimony). But it is precisely those radio broadcaster job series in which plaintiffs' own statistics reveal improvement in hiring women after the Court's 1984 finding of liability. *See* Pl.Ex. 192(a), (b); 236(a), (b). The Court can only regard this evidence as showing that the agency has made a successful, good-faith effort to end discriminatory treatment of women in its subjective (and objective) employment practices. There is no evidence to support any assertion that this effort will not continue in future with even greater success. As the Court cannot find an adequate basis in the record for the requested prospective relief, it must deny plaintiff's request.

## VIII. THE COURT WILL RESERVE JUDGMENT ON PLAINTIFFS' REQUEST FOR ATTORNEY'S FEES.

Plaintiffs have asked the Court to order an interim award of attorney's fees and to find that individual claimants are entitled to attorney's fees for representation at *Teamster* hearings as long as those claims were not patently frivolous. Defendant has asked the Court to defer ruling on questions relating to fee awards until the parties have had an opportunity to discuss and try to resolve the issue. The Court agrees that resolution of these matters by consent is far preferable to resolution by court order and it will therefore defer ruling on plaintiffs' request for thirty days from the date of the Order accompanying this Opinion. At the end of that period, plaintiffs may renew their request for interim fees or for a determination that individual claimants are entitled to fee awards for representation at the *Teamster* hearings.

## IX. CONCLUSION.

In this Opinion and the accompanying Order, the Court sets forth a concrete plan for remedying victims of the United States Information Agency's ten-year policy of discriminating against women who applied for jobs in six broad categories of employment. This Opinion details the steps that must be taken in the near future to assure that each plaintiff receives her due.

First, the agency must undertake a comprehensive effort to notify potential class members that they can finally obtain a remedy for the discriminatory decision to deny them employment. Those class members who were not applicants to the foreign service are eligible for individualized determinations of their claims and, if they succeed in those individualized hearings, may receive monetary awards as well as hiring priorities. Foreign service applicants will, by virtue of the competitive examination required for entry into the Foreign Service, obtain relief through a process designed both to remedy discrimination and ensure that the tradition of excellence so essential to our nation's foreign service remains uncompromised.

There remain some unsettled issues in this case. Most prominently, the Court has asked the parties to try to reach some

resolution that would avoid the need for individualized hearings. Assuming such hearings are necessary, the Court will defer decision on whether the individualized hearings to be afforded to much of the plaintiff class will be conducted by Special Masters or a United States Magistrate sitting as a Master. Finally, the Court will defer consideration of plaintiffs' request for attorney's fees.

The Court will issue an Order, of even date herewith, memorializing these findings of fact and conclusions of law.

## ORDER

On November 16, 1984, this Court found defendant liable for sex discrimination in six broad job categories within the United States Information Agency ("the agency"). In accordance with that Opinion, and with the Opinion of even date herewith setting forth a remedial scheme for implementing that 1984 decision, and for the reasons set forth therein, it is this 16th day of January, 1988,

ORDERED that any and all documents sent to class members in this case shall refer to the job categories at issue in this suit by their current and former titles and Job Series numerical designations; and it is

FURTHER ORDERED that defendant's motion for summary judgment on the claims of women who had applied for foreign service positions at the agency shall be, and hereby is, denied in all respects except that women who actually sought relief under the consent decree in *Palmer v. Shultz,* Civil Action No. 76–1439, shall not be eligible for relief in this suit; and it is

FURTHER ORDERED that a woman who submitted multiple applications for the jobs at issue in this suit during the time period relevant to this suit and was rejected for at least one such position shall be a member of the plaintiff class notwithstanding any later offers of employment from the agency; and it is

FURTHER ORDERED that a woman who applied for a position at issue in this suit during the time period relevant to this suit shall be a member of the plaintiff class notwithstanding the fact that defendant hired another woman for the job for which she applied; and it is

FURTHER ORDERED that a female non-resident alien who applied for a job at issue in this suit, which was to be performed within the territorial boundaries of the United States, during the time period relevant to this suit shall be a member of the plaintiff class; and it is

FURTHER ORDERED that the plaintiff class shall open on October 8, 1974; and it is

FURTHER ORDERED that the plaintiff class shall close on November 16, 1984; and it is

FURTHER ORDERED that defendant shall bear the full expense of notifying potential members of the plaintiff class about this lawsuit and the remedies available thereunder; and it is

FURTHER ORDERED that defendant shall send notice, by certified mail, to each and every female who applied for the non-foreign-service jobs at issue in this suit during the relevant time period and who can be identified by a search through defendant's files; and it is

FURTHER ORDERED that defendant shall mail such notices within thirty days of the date on which the Court approves class notice; and it is

FURTHER ORDERED that defendant shall publish the class notice to the non-foreign-service-applicant component of the plaintiff class in: (a) the largest newspaper in each of the eighteen largest Standard Metropolitan Statistical Areas in the country; and (b) all newspapers and other publications listed on Plaintiffs' Exhibit 210; and it is

FURTHER ORDERED that defendant shall publish such notices once per week for four weeks in each of the above-mentioned newspapers, including publication on at least one Sunday in newspapers that have a Sunday edition. This publication shall begin in the middle of the month and continue for four weeks thereafter; and it is

FURTHER ORDERED that defendant shall publish such notices in four issues of the above-mentioned journals; and it is

FURTHER ORDERED that such published notices shall be of a physical size, appearance, and location within the newspaper or journal calculated to attract the reader's attention; and it is

FURTHER ORDERED that such publications shall begin within thirty days of the date on which the Court approves class notice; and it is

FURTHER ORDERED that defendant shall ensure that class notice for the non-foreign-service-applicant component of the plaintiff class is posted in all United States Information Agency and Voice of America personnel offices, as well as the national and all regional offices of the Office of Personnel Management; and it is

FURTHER ORDERED that such notices shall be posted within thirty days of the date on which the Court approves class notice; and it is

FURTHER ORDERED that defendant shall give a copy of class notice for the non-foreign-service-applicant component of the plaintiff class to all women who apply for employment at the agency; this obligation shall begin within three days after the Court approves class notice and shall continue throughout the period in which potential members of the plaintiff class may submit proof-of-claim forms; and it is

FURTHER ORDERED that defendant shall send class notice for the non-foreign service applicant component of the plaintiff class, via certified mail, to each and every current female employee and purchase order vendor within thirty days after the Court approves class notice; and it is

FURTHER ORDERED that defendant shall search any and all files maintained on former employees and former purchase order vendors in order to identify any former female employees or purchase order vendors who unsuccessfully applied for employment within the relevant non-foreign-service job categories during the time period relevant to this suit; and it is

FURTHER ORDERED that defendant shall send class notice, via certified mail, to any such unsuccessful applicants for the non-foreign-service jobs at issue in this suit within thirty days after the Court approves class notice; and it is

FURTHER ORDERED that plaintiffs shall be permitted to submit interrogatories and requests for production of documents to United States Information Agency and Voice of America selecting officers and to conduct depositions of such officials. This discovery shall be designed only to facilitate identification of potential members of the plaintiff class who were orally encouraged to apply, or orally discouraged from applying, for the jobs at issue in this suit during the time period relevant to this suit; and it is

FURTHER ORDERED that class notice provided to non-foreign-service applicants shall include the following: (a) a description of the nature of this lawsuit; (b) a statement that the Court found defendant liable for sex discrimination against female applicants for certain positions and by job categories within the Agency; (c) a list of the job titles and series numbers in which the Court found discrimination and a list of any reclassification of those job titles and numerical designations; (d) a statement that the case is now in the remedial phase; (e) a statement that any woman who applied for a job in one of the relevant categories during a period from October 8, 1974, through November 16, 1984, may be a member of the plaintiff class; (f) a statement that any woman who believes she may be a member of the plaintiff class must obtain a "proof of claim form" from plaintiffs' counsel or a USIA, VOA, or OPM personnel office and must submit a completed proof-of-claim form to plaintiffs' counsel by a date certain; and (g) the process whereby class members can obtain relief and a description of the types of relief that may be available; and it is

FURTHER ORDERED that class notice provided to foreign service applicants shall include the following: (a) a description of the nature of this lawsuit; (b) a statement that the Court found defendant liable for

sex discrimination against female applicants for certain positions and by job categories within the Agency; (c) a list of the job titles and series numbers in which the Court found discrimination and a list of any reclassification of those job titles and numerical designations; (d) a statement that the case is now in the remedial phase; (e) a description of the foreign service applicants who are eligible for relief; (f) the process through which relief for foreign service applicants will be determined and the nature of the relief available; and (g) the steps that potential foreign service applicant-claimants must take next; and it is

FURTHER ORDERED that the parties shall confer to develop class notices consistent with this Opinion and shall submit these proposed notices to the Court within sixty days of the date of this Order; and it is

FURTHER ORDERED that the "proof-of-claim" forms to be submitted in this case shall ask the following of each non-foreign-service claimant: (a) what position she sought; (b) the approximate date on which she applied for the job; (c) a statement that her application was rejected; (d) name, address, telephone number, and whether she currently wishes to be considered for a position at USIA or VOA. In addition, the proof-of-claim form shall inform potential claimants that they will have the burden of proving that they applied and were rejected for a position at issue in this suit during the time period relevant to this suit. The proof-of-claim form shall not state that claimants have the burden of showing that they were "minimally qualified," according to OPM standards, for the jobs for which they applied; and it is

FURTHER ORDERED that the parties shall confer to develop a proof-of-claim form that meets the requirements set forth herein and shall submit this proposed form to the Court when they submit proposed Class Notice; and it is

FURTHER ORDERED that plaintiffs' counsel shall send a copy of the Court-approved proof-of-claim form to each and every non-foreign-service respondent to the

class notice within ten days after receiving such response; and it is

FURTHER ORDERED that plaintiff shall be entitled to reimbursement from defendant for the cost of those mailings; and it is

FURTHER ORDERED that the parties shall confer about the possibility that relief similar to that ordered in *Thompson v. Boyle,* 499 F.Supp. 1147 (D.D.C.1979), *aff'd,* 678 F.2d 257 (D.C.Cir.1982) might be appropriate in this case and shall inform the Court in writing, within thirty days of the date of this Order, if *Thompson* -type relief is possible in this case. The parties shall at that time submit either a proposal for the scope and contours of that relief, an abbreviated briefing schedule addressing issues that the parties cannot resolve, or a joint statement explaining why such relief may not be ordered in this case; and it is

FURTHER ORDERED that, if the parties inform the Court that *Thompson* -type relief is possible in this case, and the Court concurs with that assessment, the Court will vacate the portions of this Order setting forth the process and type of relief available to non-foreign-service-applicant members of the plaintiff class and will consider the scope and contours of the alternative *Thompson* -type relief; and it is

FURTHER ORDERED that, unless the parties inform the Court that *Thompson* -type relief is possible in this case, each potential member of the plaintiff class who submits a proof-of-claim form shall receive an individualized hearing on her claim; and it is

FURTHER ORDERED that, within thirty days after the last day on which class notice is published, plaintiffs shall inform the Court of the number of positive respondents to the class notice; and it is

FURTHER ORDERED that the Court shall, on the basis of the number of positive respondents to the class notice, determine whether individualized hearings shall be conducted by a United States Magistrate or by one or more Special Masters; and it is

FURTHER ORDERED that each claimant who is entitled to an individualized

hearing must prove at that hearing, by a preponderance of the evidence, that she applied for a position at issue in this suit during the time period relevant to this suit and that she was rejected for that position. Any plaintiff who so proves shall be entitled to a presumption that she was not hired because of discrimination on the basis of sex; and it is

FURTHER ORDERED that defendant shall be able to overcome that presumption by proving, by clear and convincing evidence, that he had a legitimate, non-discriminatory reason for rejecting the claimant's application; and it is

FURTHER ORDERED that the claimant must be allowed to offer evidence designed to show that any proffered legitimate, non-discriminatory reason for defendant's action was a pretext for discrimination; and it is

FURTHER ORDERED that claimants who prevail at an individualized hearing shall be entitled to "make-whole" relief, including back pay, and, if appropriate, front pay, retroactive promotion, and hiring priorities if any claimant currently wishes to be considered for employment at the agency; and it is

FURTHER ORDERED that the cut-off date for any back pay award shall be the day on which the award is approved for the particular claimant; and it is

FURTHER ORDERED that back pay shall be calculated on the basis of a "proxy salary" to be constructed by the Magistrate or Master in charge of the individualized hearings on the basis of the average earnings and promotions history of persons hired for each job at issue in this suit and still employed by defendant; and it is

FURTHER ORDERED that the Master or Magistrate who establishes these "proxy salaries" shall calculate these salaries for each year at issue in this suit; and it is

FURTHER ORDERED that back pay shall include the monetary value of fringe benefits and the value of any overtime or shift differentials that each claimant would have been eligible to receive had she not been the victim of discrimination; and it is

FURTHER ORDERED that the Master or Magistrate who conducts the individualized hearing shall submit to the Court for its approval an analysis of what fringe benefits should be included in back pay, how to value those fringe benefits, whether a claimant is entitled to the monetary value of overtime or shift differentials and, if so, what that value is; and it is

FURTHER ORDERED that front pay shall be calculated by the same formula used to determine the back pay awards; and it is

FURTHER ORDERED that a claimant who prevails in the individualized hearing and wishes to be considered for employment at the agency shall receive front pay, if no appropriate job is currently available, either until she receives an appropriate position at the agency or until a date certain, based on an estimate of the period it should take the individual to find employment, the claimant's work expectancy, and her life expectancy; and it is

FURTHER ORDERED that all back pay awards shall be reduced by the amounts that a claimant earned or could have earned with reasonable diligence in a position substantially equivalent to the one denied her; and it is

FURTHER ORDERED that, once a claimant has presented evidence on damages at the individualized hearing, defendant shall have the burden of producing evidence to show interim earnings or lack of diligence in light of the existence of a substantially equivalent position that the claimant either turned down or failed to find; and it is

FURTHER ORDERED that any unemployment compensation that a claimant may have received as a result of a job termination prior to applying for a job at issue in this suit shall not be considered earnings that mitigate damages awardable to the claimant; and it is

FURTHER ORDERED that defendant shall, within sixty days of the date of this Order, obtain a list of the names, addresses, and foreign service examination scores of women who applied to the Foreign Ser-

vice between October 8, 1974, and November 16, 1984, and were rejected; and it is

FURTHER ORDERED that defendant shall create a rank-order list of the women who unsuccessfully applied for Foreign Service Officer positions at the agency, or who failed the USIA "cone" of the joint Foreign Service exam, between October 8, 1974, and November 16, 1984; and it is

FURTHER ORDERED that defendant shall invite some portion of these women, through the class notice, in descending order of examination scores, to compete alongside current Foreign Service applicants in the Oral Assessment process; and it is

FURTHER ORDERED that those claimants who pass the Oral Assessment process shall undergo the Medical and Security checks that Foreign Service candidates ordinarily undergo; and it is

FURTHER ORDERED that those claimants who survive the Medical and Security checks shall be reviewed by the Final Review Panel but shall be compared only to each other by the Final Review Panel; and it is

FURTHER ORDERED that the parties shall confer about the number of Foreign Service applicant-class members that should be invited to participate in the remedial process outlined above and who could, if successful, be absorbed over a reasonable time period by the agency; and it is

FURTHER ORDERED that, within sixty days of the date of this Order, the parties shall submit briefs to the Court outlining the areas of agreement and disagreement about the number of jobs to be made available for Foreign Service applicant-class members and the number of Foreign Service applicant-class members that should be invited to participate in this reassessment process; and it is

FURTHER ORDERED that, on the basis of the record before the Court, no prospective relief is available in this case; and it is

FURTHER ORDERED that the Court will reserve ruling on plaintiffs' request for attorney's fees so that the parties may have an opportunity to discuss and resolve this issue; and it is

FURTHER ORDERED that, if necessary after such discussions, plaintiffs may renew their requests for interim attorney's fees or for a determination that individual claimants are entitled to fee awards for representation at the individualized hearings.