Martin W. **BARBOUR,** Plaintiff,

v.

**MEDLANTIC MANAGEMENT CORP., et al., Defendants.**

**Civil Action No. 89–3133 (JHG).**

United States District Court, District of Columbia.

Feb. 6, 1997.

---

858

Martin W. Barbour, Great Falls, VA, pro se.

John Michael Clifford, McLeod, Watkinson & Miller, Washington, DC, Theodore Edward Trabue, Jr., Hamilton & Hamilton, Washington, DC, Michael Leroy Stevens, Henry Morris, Jr., Samuel K. Charnoff, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, John Michael Clifford, Christine Mary Cooper, McLeod, Watkinson & Miller, Washington, DC, Theodore Edward Trabue, Jr., Michael Leroy Stevens, Henry Morris, Jr., Samuel K. Charnoff, John Michael Clifford, Christine Mary Cooper, Arthur Gary Kahn, Levin & Gann, Baltimore, MD.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This matter is before the Court to determine whether Plaintiff Martin W. Barbour ("Barbour") is entitled to front pay, and if so, the amount and duration of that front pay. While Barbour contends that he should be awarded front pay until the year 2005 (totaling over $2 million), Defendants Medlantic and Mark Merrill argue that Mr. Barbour's entitlement to front pay, if any, ended when he voluntarily left Columbia Hospital for Women ("CHW") in October of 1992 (justifying an award of only $8,865.91). Upon considering the evidence presented at the evidentiary hearing and the entire record in this matter, including the demeanor and credibility of the witnesses, Mr. Barbour will be awarded $36,239.86 in front pay plus post-judgment interest as provided by law.

### I. Background

In 1992, Martin W. Barbour successfully sued the defendants under 42 U.S.C. § 1981, contending that they had refused to hire him as Medlantic's Director of Corporate Materials Management because he was an African-American. A jury awarded Barbour com-

pensatory damages in the amount of $2,500 and punitive damages in the amount of $25,-000. Based on the jury's verdict, this Court awarded Barbour back pay in the approximate amount of $84,000. However, the Court denied Barbour's request for prejudgment interest and front pay, holding that the front pay demand was unsupported by the evidence and that any such award would be unduly speculative. The Court also denied the defendants' post-trial motion for judgment as a matter of law.

The defendants appealed the denial of their post-trial motion and the award of punitive damages, and Barbour cross-appealed the Court's dismissal of the conspiracy count against Defendant Gregory Walling on summary judgment, the calculation of back pay and the denial of front pay and prejudgment interest. The Court of Appeals affirmed on all grounds, save front pay and prejudgment interest. *Barbour v. Merrill,* 48 F.3d 1270 (D.C.Cir.1995).

Expressly noting that the plaintiff carries the burden to establish the value of lost salary and fringe benefits, the Court of Appeals upheld the back pay calculation fixing the base salary at $70,000 and the District Court's refusal to include a signing bonus and a $200 per month car allowance. *Id.* at 1274. The Court of Appeals held that Barbour was entitled to prejudgment interest and that, on remand, this Court was to determine whether Barbour was entitled to front pay and, if so, its duration and amount. The Court of Appeals stated: "The court had already weighed the evidence to establish a salary base when it calculated the back-pay award. All that remained was to incorporate any proper salary increases, and then to determine the award's present value, using an appropriate discount table." *Id.* at 1280. The Court of Appeals stated:

Factors that the Court may wish to consider include, but are not necessarily limited to: Barbour's age; Barbour's entirely reasonable intention to remain at Medlantic until retirement, had Medlantic hired him; the length of time Medlantic's Directors of Corporate Materials Management typically held that position; how long Rich [the person hired instead of Barbour] held that

position; the length of time persons in similar positions at other companies generally hold those positions; Barbour's efforts at mitigation (including consideration of the current job market and industry conditions, as well as the amount of time reasonably required for Barbour to secure comparable employment); and whether Medlantic in any other way supported its claim that Barbour would not have remained at Medlantic until his retirement.

48 F.3d at 1280.

The defendants' suggestion for rehearing *en banc* was denied on May 16, 1995. *See* Order (per curiam), 48 F.3d at 1281; *see also id.* (Williams, J., concurring) ("Although the evidence supporting an inference of discrimination seems to me thin to the point of invisibility, such an intensely fact-bound issue is unsuitable for *en banc* review."). The defendants' petition for certiorari was granted in part, —— U.S. ——, 116 S.Ct. 805, 133 L.Ed.2d 752 (1995), but, on February 28, 1996, certiorari was voluntarily dismissed. —— U.S. ——, 116 S.Ct. 1037, 134 L.Ed.2d 113 (1996). On March 6, 1996, the Court of Appeals issued its mandate and the matter returned to this Court for action on remand. After granting additional discovery, the Court held a two-day evidentiary hearing on damages.

## II. Findings of Fact

The following facts were established at the evidentiary hearing through the testimony of four witnesses offered by Barbour (including himself), five witnesses offered by the defendants (including Barbour) and various exhibits. Barbour holds both a Bachelor of Science degree and a Masters Degree in Business Administration. Barbour had a distinguished 25–year career in the United States Army during which he received training as a medical materials management officer, was promoted to the rank of Lieutenant Colonel (O–5), and held a series of materials management and executive-level positions for a variety of functions, including personnel, finance, accounting, general administration, and supply and services. In essence, Barbour served as the "chief operating officer" for several organizations, including Walter Reed Army Medical Center.

Throughout his military career, he received highly favorable performance evaluations.

In 1987, at the approximate age of 47, Barbour retired from the military. He accepted a position as Director of Materials Management at CHW where he was responsible for purchasing, inventory control, central duplicating, linen management services and transportation. His predecessor at CHW had held that position for approximately six years. Barbour's starting salary at CHW was $35,006.40. During his tenure, he received favorable annual evaluations and merit salary increases ranging between four and six percent. His average percentage increase was 5.3% over the period of his employment. In 1992, his last year at CHW, his salary was $45,323.[1]

In 1989, at the approximate age of 49, the plaintiff competed for the position at Medlantic, but was not selected, leading to his allegation of discrimination and this suit. The person Medlantic hired instead of Barbour was Mr. Terry Rich.[2] (Rich's predecessor had held the position of Director of Materials Management for three to five years.) Rich had previously held his position as Director of Materials Management at the Forbes Health System for approximately 14 years. On June 18, 1992, the jury rendered its verdict in favor of Barbour, awarding him compensatory and punitive damages.

On October 27, 1992, at the approximate age of 52, Barbour voluntarily resigned from CHW for personal reasons unrelated to work.[3] At the time he left CHW, Barbour had no offers of employment or job interviews scheduled.

During 1992, at an unspecified date and as part of a corporate restructuring, Medlantic ceased to employ anyone at all. Rich's position, the job that Barbour had sought in 1989, was among those eliminated. As a result of this reorganization, Rich no longer held the "multi-hospital" management responsibilities that the plaintiff desired in 1989 and continued to seek up to the instant evidentiary hearing. In 1992, Rich was offered, and accepted, a position as Assistant Administrator for Materials Management at the Washington Hospital Center where he was responsible for its printing operation, mail room, linen distribution, laundry operation, biomedical engineering department, telecommunications and laser safety programs. His selection for the new position, which paid a salary of approximately $100,000, was not made on a competitive basis. In or about early 1994, Rich became Assistant Vice President for Material and Biomedical Manage-

1. *See* Transcript of Evidentiary Hearing at 57 (July 8, 1996, a.m. session). Barbour had available to him, but did not use, the employer's health care insurance program, because, as a retired military officer, Barbour and his spouse could use the military health care system.

2. Rich was not Medlantic's first choice. Its first choice was Craig Shoup. At the evidentiary hearing, Barbour relied upon the trial testimony by Defendant Merrill stating that Shoup had held a position as a director of corporate materials management for 18 years. No evidence was offered by Barbour at the hearing regarding the nature and scope of responsibilities for this position.

3. The fact that Barbour left CHW for personal reasons unrelated to work was established by stipulation of the parties at the evidentiary hearing. *See* Transcript of Evidentiary Hearing at .13–15 (July 8, 1996, a.m. session); *see also* Plaintiff's Proposed Findings of Fact and Conclusions of Law at 7, ¶3 (filed Aug. 2, 1996). While a voluntary quit may not reduce an award where the plaintiff cites compelling reasons to quit, *see Sennello v. Reserve Life Ins.,* 667 F.Supp. 1498,

1514 (S.D.Fla.1987), the parties' stipulation established that Barbour had no such compelling reasons.

After the hearing, Plaintiff Barbour sought to counter-designate to deposition excerpts in which he testified to alleged problems relating to his employment at CHW. While the exact purpose of his counter-designations is unclear, the parties' stipulation controls, and any counter-designations that suggest to the contrary will be given no weight by the Court. In reliance upon the plaintiff's stipulation, the defendants refrained from calling certain witnesses at the hearing. Having obtained certain benefits from the stipulation, the plaintiff is estopped from revoking it indirectly. Additionally, Fed.R.Civ.P. 32(a)(2) does not permit Barbour to use his deposition in this manner. Even were this a permissible use of his deposition, the Court would bar Barbour from offering evidence regarding the circumstances of his departure from CHW due to his failure to answer questions related to this issue during discovery despite the Court's ruling that questions in this area were appropriate. *Compare* Transcript of Status Hearing at 14–17 (Apr. 24, 1996) *with* Transcript of Plaintiff's Deposition at 41–46 & 53–54 (May 24, 1996).

ment and Technology at the Washington Hospital Center.

In June of 1993, after having voluntarily left CHW the previous fall, Barbour was hired at an annual salary of $46,508 by PHP Healthcare Corporation ("PHP") as a procurement specialist. During his tenure with PHP, the plaintiff received good evaluations and, in 1994, he received a 4.5% merit increase, raising his salary to $48,609. During his employment with PHP, he earned $25,-151.84 in 1993, $47,383.16 in 1994, and $6,782.76 in 1995.[4] In early 1995, after PHP lost its government contract, Barbour was terminated.

A considerable portion of the evidentiary hearing involved Barbour's efforts to seek comparable employment. He testified that after leaving CHW, he enrolled with the Virginia Employment Commission and met with an employment counselor to identify job openings. He also met with a church-sponsored support group, "networked" among his associates and looked for job vacancies in various newspapers. Barbour spent a few hours each week on his job search efforts, which generally included reviewing the Sunday *Washington Post*, and then preparing and mailing several applications.[5] He did not retain the services of a job placement agency.

Barbour testified that since resigning from CHW, he had applied for approximately eighty positions or an average of two per month. After leaving PHP in January of 1995 and up to the date of the hearing, the evidence offered indicated that Barbour submitted fewer than 20 applications, including approximately 14 in 1995 and four in the first six months of 1996.[6] Since 1992, Barbour has had three or four job interviews, including the interview with PHP. Barbour testified that if a prospective employer did not respond to his application and/or resume, he assumed that the employer was not interested in him and he did not contact that employer as a follow-up measure.[7] In contrast, in the 1980s when he was seeking employment with the University of Maryland, Prince Georges County and with Medlantic, Barbour's testimony indicated that he had been more aggressive, following-up his applications with telephone calls.

At the hearing, Barbour testified that he focused his job search on those positions that he believed were substantially equivalent to the position at Medlantic: positions paying the compensation that Rich was currently earning (over $100,000) and which entailed materials management responsibilities for a multi-hospital system.[8]

The defendants presented expert testimony on the mitigation of damages in the employment context through their expert, Andrew Nussdorf.[9] Nussdorf testified that based on a random survey which he conducted in June 1996, nine local hospitals paid salaries ranging between $41,000 and $84,000 to their materials management directors. He also testified that several positions as

---

**4.** He did not participate in PHP's 401(k) plan, but did participate in the employer-paid health insurance plan.

**5.** Barbour conceded at the hearing that the job search materials which he had collected advised job seekers to make their search efforts a "full time" job—recommending that 6–8 hours/day be spent looking for employment.

**6.** Barbour testified that he submitted more job applications, but the computer disk with those applications had been inadvertently erased. However, no credible evidence was offered regarding the number of applications that were erased.

**7.** At the hearing, Barbour also conceded that his job search literature recommended follow-up calls to prospective employers.

**8.** While Barbour sought (and continued to seek at the time of the hearing) a position offering salary on par with that received by Rich, this Court previously held, and the Court of Appeals affirmed, that Barbour was not necessarily entitled to the same salary. *See* 48 F.3d at 1278 ("But Barbour is not necessarily entitled to the identical compensation as Rich."). Moreover, while seeking Rich's current salary, Barbour is also seeking a position that Rich does not currently hold: one that offers multi-hospital management responsibilities.

**9.** Nussdorf holds a B.A. in psychology, a Masters of Arts in rehabilitation counseling, and he has worked in the field of vocational rehabilitation counseling for approximately 18 years. The plaintiff did not object to his qualification by the Court as an expert.

director of materials management had been open in the Washington, D.C., area since 1992, including at Greater Southeast Hospital, D.C. General Hospital and Suburban Hospital.

Based upon the plaintiff's experience and education, Nussdorf testified that Barbour should have been able to obtain employment within six to twelve months of departing CHW at a salary ranging between $52,000 and $68,000. Nussdorf concluded that Barbour's efforts were inadequate, citing the plaintiff's failure to dedicate sufficient time and effort to his job search and his failure to follow-up on his applications. Nussdorf also testified that Barbour undermined his employability by leaving CHW before he had lined up prospects for new employment.

Both parties offered testimony by expert witnesses on damages, relevant aspects of which the Court has addressed in Part IV, *infra,* in awarding damages.

### III. Conclusions of Law

 The Court has broad discretion in fashioning an equitable remedy in discrimination cases. Front pay is one of the tools available to the Court in awarding equitable relief, and it may be used, where warranted, to compensate a victim of discrimination for the continuing future effects of discrimination until the victim is made whole. *See Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1529 (11th Cir.1991); *Shore v. Federal Express Corp.,* 777 F.2d 1155, 1159 (6th Cir. 1985); *Thompson v. Sawyer,* 678 F.2d 257, 293 (D.C.Cir.1982). Front pay is intended to serve as restitution for the victim, not to punish an employer. It is certainly not "intended to insure a plaintiff's future financial success." *McKnight v. General Motors Corp.,* 973 F.2d 1366, 1371 (7th Cir.1992).

 Determining the amount and duration of front pay requires some speculation because assumptions about the future are necessary. *Reneau v. Wayne Griffin & Sons, Inc.,* 945 F.2d 869, 870 (6th Cir.1991); *Green v. USX Corp.,* 843 F.2d 1511, 1531 (3rd Cir.1988). The greater the period for which front pay is sought, the more speculative the award becomes. *See Hybert v. Hearst Corp.,* 900 F.2d 1050, 1056 (7th Cir.1990); *see also*

*McKnight,* 973 F.2d at 1372. Nevertheless, front pay generally ends when a victim has had a reasonable amount of time to secure comparable employment. *See Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 889 (3rd Cir. 1984) (awarding four months front pay). If awarded, it should be reduced by the amount that the victim actually earned or could reasonably have earned during the front pay period. *See Ford Motor Co. v. E.E.O.C.,* 458 U.S. 219, 231, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721 (1982); *Rasimas v. Michigan Dep't of Mental Health,* 714 F.2d 614, 623 (6th Cir.1983); *Clark v. Marsh,* 665 F.2d 1168, 1172 (D.C.Cir.1981); *Hartman v. Wick,* 678 F.Supp. 312 (D.D.C.1988).

In this case, the Court of Appeals has identified factors that this Court is to consider when determining the amount and duration of a front pay award. Each of those factors is discussed below. As threshold matters, however, the Court will address the plaintiff's attempt to relitigate the base salary amount as well as the defendants' arguments that Barbour should receive no front pay after October 27, 1992, because he unreasonably left CHW and because he thereafter failed to mitigate his damages by reasonably pursuing employment that was substantially equivalent.

### 1. The defendants' affirmative defense of failure to mitigate

The defendants argue that Barbour should be denied front pay as of the date when he voluntarily left CHW without alternative employment and because, they claim, Barbour failed to exert reasonable efforts to seek employment thereafter. Barbour argues that he was not obligated to remain in a position that was not comparable to the one at Medlantic and that, in any event, he reasonably sought employment during the interim period.

 Discrimination plaintiffs who fail to mitigate their damages may forfeit their entire entitlement to an award of front pay. A plaintiff must make a reasonable effort to find new employment that is substantially equivalent to the position of which he was deprived. *NLRB v. Madison Courier, Inc.,* 472 F.2d 1307, 1318 (D.C.Cir.1972). The de-

fendants bear the burden to establish a failure to mitigate as well as interim earnings. *Anastasio v. Schering Corp.*, 838 F.2d 701, 707 (3rd Cir.1988); *Rasimas,* 714 F.2d at 624. To satisfy this burden, they must demonstrate that substantially equivalent positions were available and that the plaintiff failed to use reasonable diligence to obtain such positions. *Rasimas,* 714 F.2d at 624. The defendants are not required to show that the victim *would have* obtained suitable employment, but only that the victim failed to act reasonably in pursuing such employment. *NLRB v. Madison Courier, Inc.*, 472 F.2d at 1319. Mitigation requires an honest, good-faith effort in pursuing employment. *Id.* at 1318. It also requires the exercise of reasonable diligence to "maintain a suitable job once it is located." *E.E.O.C. v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992); *see also Jurgens v. E.E.O.C.,* 903 F.2d 386, 389 (5th Cir.1990); *Brady v. Thurston,* 753 F.2d 1269, 1277–78 (4th Cir.1985). To deny an award due to a plaintiff's failure to mitigate, the defendant must prove that the plaintiff's search was "so deficient as to constitute an unreasonable failure to seek employment." *E.E.O.C. v. Kallir, Philips, Ross, Inc.*, 420 F.Supp. 919, 925 (S.D.N.Y. 1976).

■■■ Here, the defendants have demonstrated that substantially equivalent positions were available, but they have not shown that Barbour's weak search efforts were "so deficient as to constitute an unreasonable failure to seek employment." *Kallir, Philips, Ross, Inc.*, 420 F.Supp. at 925. The defendants focus on Barbour's failure to spend more than a few hours a week engaged in his job search effort, his failure to send more than a few resumes per month and his failure to follow-up those resumes with phone calls. *See McIntosh v. Irving*

*Trust Co.*, 873 F.Supp. 872, 879 (S.D.N.Y. 1995). While they have persuasively established that his efforts were certainly less than aggressive, Barbour did apply for eighty positions since October of 1992. *Compare Anastasio,* 838 F.2d at 708 (60 job applications demonstrates reasonable diligence); *Sprogis v. United Air Lines, Inc.*, 517 F.2d 387, 392 (7th Cir.1975) (one application and two-month temporary job in two-year time period deemed reasonable). He has obtained several job interviews. Barbour has not removed himself from the job market, as did the plaintiff in *Sellers v. Delgado,* 902 F.2d 1189, 1196 (5th Cir.1990). While his lack of success may be directly attributed to his low key approach and his decision to place greater priority on matters other than seeking employment,[10] his search efforts were not so unreasonable as to bar front pay entirely.[11]

■■■ In contrast to his minimally acceptable job search efforts is his unreasonable decision to leave CHW without having another position lined up (or even having interviews scheduled). By voluntarily quitting suitable employment for personal reasons, he has failed to exercise reasonable diligence. *See Delight Wholesale,* 973 F.2d at 670; *United States v. City of Chicago,* 853 F.2d 572, 579 (7th Cir.1988); *Brady,* 753 F.2d at 1277; *Oil, Chem. & Atomic Workers Int'l Union v. NLRB,* 547 F.2d 598, 602–03 (D.C.Cir.1976); *Sennello v. Reserve Life Ins. Co.*, 667 F.Supp. 1498, 1513 (S.D.Fla.1987), *aff'd* 872 F.2d 393 (11th Cir.1989). Through his voluntary resignation, Barbour freely chose to incur a loss in his earnings. *Brady,* 753 F.2d at 1278. It would be unfair to saddle the defendants with the costs associated with Barbour's unreasonable decision. Accordingly, his front pay award will be decreased by the actual earnings that he received from CHW between June and October of 1992 as well as by the earnings that he

---

**10.** Barbour testified on direct that he spent considerable time on his *pro se* litigation: "So I will admit readily that, yes, quite a bit of my time has been spent in the legal realm as part of my efforts to continue the prosecution of this case." Transcript of Evidentiary Hearing at 35 (July 8, 1996, a.m. session); *see also id.* at 84–87 (cross-examination). The amount of time that a *pro se* litigant devotes to litigation as opposed to looking for work can be relevant in awarding dam-

ages. *See Reed v. Megamarts, Inc.*, 73 F.3d 364 (Table), unpublished op. at 1996 WL 5537 (7th Cir.1996); *Sias v. City Demonstration Agency,* 588 F.2d 692, 697 (9th Cir.1978).

**11.** As discussed *infra,* however, his relaxed job search efforts are relevant to determining the duration of a fair front pay period.

would have received had he remained at CHW. *See, e.g., Cassino v. Reichhold, Inc.,* 817 F.2d 1338, 1347 (9th Cir.1987); *Clark,* 665 F.2d at 1172; *Hartman,* 678 F.Supp. at 337; *Sennello,* 667 F.Supp. at 1513.

## 2. The base salary

Barbour has requested that the Court include fringe benefits in his front pay award, including pension benefits, health and life insurance benefits and a tax component boost to account for the tax liability that he contends he would incur for a lump sum award. He also asks for FICA, social security and Medicare tax adjustments. The defendants object.

In determining Barbour's back pay award, this Court previously established Barbour's base salary at $70,000. The Court rejected Barbour's claim that he was entitled to the same salary that Terry Rich received, $85,-000, and rejected his requests for a $200 per month car allowance and a signing bonus, which Rich allegedly received. Barbour appealed this Court's decisions, but the Court of Appeals affirmed: "Although back pay should generally include the value of lost fringe benefits, the plaintiff bears the initial burden of establishing the value of the lost salary and benefits. The district court reasonably concluded that Barbour did not meet this burden...." 48 F.3d at 1278.

The Court of Appeals' mandate on remand was not ambiguous: "The court had already weighed the evidence to establish a salary base when it calculated the back pay award. All that remained was for it to determine the appropriate duration of a front pay award, to incorporate any proper salary increases, and then to determine the award's present value, using an appropriate discount rate." *Id.* at 1280.

Barbour's base salary, upon consideration of the fringe benefits he requested and the evidence he presented, was established by this Court after the jury verdict. Barbour appealed that decision and lost. The base salary will not be reopened now, because doing so would be contrary to the law of the case, *United States v. Singleton,* 759 F.2d 176, 177–78 (D.C.Cir.1985); *Shakespeare Co. v. Silstar Corp.,* 906 F.Supp. 997, 1001

(D.S.C.1995), and because it exceeds the scope of the remand. *See, e.g., Shore v. Federal Express Corp.,* 42 F.3d 373, 379 (6th Cir.1994) (plaintiff barred from seeking to include pension benefits in front pay award for the first time on remand); *Alberta Pork Producers' Mktg. Bd. v. United States,* 683 F.Supp. 1398, 1403 (C.I.T.1988) (arguments that could have been raised earlier cannot be asserted on remand as beyond scope of remand).

The request for a $700,000 tax boost will be rejected for additional reasons. First, an income tax adjustment due to a lump sum payment is warranted only where the Court has sufficient evidence to calculate an appropriate adjustment. *See Hukkanen v. International Union of Oper. Eng'rs,* 3 F.3d 281, 287 (8th Cir.1993). Such an adjustment is to be measured as the increased, or differential, tax burden caused by the lump sum payment in a single tax year. *Gelof v. Papineau,* 829 F.2d 452, 455 (3rd Cir.1987). This is because a lump sum payment would place the plaintiff in a higher tax bracket. Here, the plaintiff's expert offered testimony only as to the plaintiff's *total* tax liability arising from a lump sum award. Having failed to offer any evidence as to the *differential* between this tax burden and what the plaintiff would bear if he were paid the front pay over time (i.e., as salary), or any evidence as how to calculate the same, the request will be rejected. The fact of a discrimination verdict does not allow the plaintiff to shift his entire tax burden to the employer. Such a result would be punitive.

His request for FICA and Medicare adjustments is also rejected. His request here is curious, because there is absolutely no basis for an award to him. Medlantic, had it hired him, would have remitted these amounts to the federal government. *See Rupp v. Purolator Courier Corp.,* 45 F.3d 440 (Table), unpublished opinion *reprinted at* 1994 WL 730892 *2 (10th Cir. Dec. 20, 1994). While Barbour may have derived some benefit from such payments had he been hired, he is not entitled to receive these amounts directly. Paying Barbour these amounts would provide him a windfall. *Id.*

866

### 3. The duration of the front pay award

 In general, front pay ends when the sting of discrimination has passed and the victim has had a reasonable amount of time to secure comparable employment. Here, the plaintiff requests front pay through the year 2005, contending that he would have remained at Medlantic until his retirement at age 65. The defendants argue that any front pay should terminate on October 27, 1992, when Barbour left CHW voluntarily for reasons unrelated to work.

Upon applying the factors identified by the Court of Appeals to the evidence on record in this case, it is clear that an award of front pay for thirteen years until the year 2005 would be inappropriate, unduly speculative, and punitive in effect. Barbour was 52 years of age when the jury returned its verdict. While marketability may wane as a person gets older, the plaintiff was not, and is not, so old that it can be reasonably expected that he will never again work. Nor is it logical to believe that, with reasonable efforts, he will not be hired for a position substantially equivalent to the one he initially sought at Medlantic. The evidence at trial established that with reasonable efforts he could expect to have been hired at a comparable position within a year of departing CHW. At age 56, Barbour clearly remains competitive in the materials management job market, having been interviewed for such a position at Greater Southeast Hospital just prior to the evidentiary hearing. See Dominic v. Consolidated Edison, 652 F.Supp. 815, 820 (S.D.N.Y.1986) (front pay until age 70 highly speculative where well-educated 52–year–old (at time of verdict) plaintiff had good prospects to obtain a more lucrative position), aff'd, 822 F.2d 1249 (2d Cir.1987). Since the plaintiff had, and still has, reasonable pros-

pects for obtaining comparable employment within a reasonable timeframe (should he exert reasonable efforts), it would be punitive and unduly speculative to award him front pay until his intended retirement date in 2005.[12] See, e.g., United Paperworkers v. Champion Int'l, 81 F.3d 798, 805 (8th Cir. 1996) (lifetime award of front pay inappropriate where plaintiff's relatively young age allowed future opportunity to mitigate damages); Hybert v. Hearst Corp., 900 F.2d 1050, 1056 (9th Cir.1990) (five-year award to 67 year-old plaintiff is too speculative); Dominic v. Consolidated Edison, 822 F.2d 1249, 1258 (2d Cir.1987) (upholding trial judge's decision awarding two years of front pay and rejecting plaintiff's claim for front pay until retirement age).

The evidence at the hearing indicated that Rich's predecessor as Medlantic's Director of Corporate Materials Management held that position for approximately three years.[13] Rich had held that position for three years until Medlantic eliminated it. No evidence was offered to indicate that it was typical for Medlantic directors to hold this position for more than three to five years. Although little persuasive evidence was offered at the hearing regarding the time period that other multi-hospital materials managers held their positions,[14] the Court notes that Barbour held his position as a materials manager at CHW for approximately five years and Barbour's predecessor had held the position for about six years.

An important factor considered by the Court is Barbour's qualifications. Barbour has an advanced degree (i.e., Masters of Business Administration) and considerable practical experience in the area of medical materials management. He also has con-

12. Barbour's expert witness on damages testified that he assumed Barbour would never work again. This testimony was neither persuasive nor credible, and it will be given no weight. Significantly, the witness acknowledged that he had no expertise in assessing the plaintiff's employment prospects or in the job market for hospital management personnel. And, on cross-examination, the plaintiff's witness testified that Barbour *should* be able to find new employment.

13. Evidence offered by the defendants prior to trial indicated that he had held the job for ap-

proximately five years. See Affidavit of Pamela Lewis, at ¶ 4 (June 13, 1996), attached to Defendants' Motion for Judgment in Their Favor as to Plaintiff's Front Pay Claim at Exhibit G.

14. The testimony at the hearing indicated that Rich and Craig Shoup (who was offered Rich's position but declined) held their previous positions for 14 and 18 years, respectively. However, Barbour did not establish that these positions were, in fact, similar to the position he sought at Medlantic.

siderable experience in other management areas. He enjoyed a successful military career, rising to the rank of Lieutenant Colonel. He is clearly a talented individual. These qualifications and practical experience should give him leverage in a job market that, with reasonable job search efforts, he could turn to his advantage.

The defendants established at the hearing that substantially equivalent positions were available in this job market and that, with reasonable efforts, the plaintiff should have been able to obtain alternative employment within six to twelve months of departing CHW.[15] While the Court has not found that the defendants have met their burden to demonstrate that Barbour's efforts to seek employment were so deficient as to bar front pay entirely, neither can it be said that his job search efforts, as outlined above, were aggressive. Based on the evidence at trial, Barbour's job search efforts for substantially equivalent employment gradually declined and were reduced substantially in 1995 and 1996. Although the Court is not persuaded that Barbour has effectively removed himself from the job market, it is obvious that reemployment is not his major priority. As an equitable matter, such tepid job search efforts are a factor that the Court takes into consideration in determining a fair front pay period.

While Barbour's stated intention to remain at Medlantic until 2005 has been characterized as "entirely reasonable," such long term employment is not consistent with his work record in the private sector as developed at the evidentiary hearing. He held the materials management position at CHW for five years before he left voluntarily. Barbour himself testified during his deposition that, from his very arrival at CHW, he was looking to leave: "I had continuously from—since I arrived at the Columbia Hospital I was continuously looking for other employment." Deposition Transcript at 103 (May 24, 1996). The Court cannot find by a preponderance of the evidence that Barbour would have felt, or acted, any differently were he to have been hired by Medlantic in 1989—only two years

after he had commenced his employment with CHW.

It is also significant (although not dispositive) that the position for which Barbour competed at Medlantic was eliminated in 1992. *See Bartek v. Urban Redev. Auth.*, 882 F.2d 739 (3rd Cir.1989) (front pay denied where position eliminated). But, in this case, complete denial of front pay strikes the Court as too draconian a result when the position, while technically eliminated, was actually converted. Barbour contends that he, like Rich, would have been transferred to this new position which entailed greater responsibility (albeit in a single hospital system). However, the job has changed significantly since 1992 and it bears little resemblance to the position Barbour originally sought. Considering his private sector work record, and in spite of his stated intentions, the Court cannot find by a preponderance of the evidence that Barbour would have remained with Medlantic long enough to have been part of the 1992 restructuring, let alone been offered the promotion that went along with it. *See, e.g., Tennes v. Com. Of Mass., Dep't of Revenue*, 944 F.2d 372, 381 (7th Cir.1991) (denial of front pay appropriate based upon plaintiff's employment record).

Determining the appropriate relief is, as the Court of Appeals has recognized, difficult because it is, in many respects, speculative. It is an inexact science, if it can be considered a science at all. The Court has considered a broad range of largely indeterminate factors without a clear formula as to how each factor relates to the others in order to establish a bottom line that makes the plaintiff whole, but which stops short of punishing the defendants. Nevertheless, based upon an amalgam of the factors cited by the Court of Appeals, the Court finds that four years is a reasonable time period within which Barbour should have been able to find comparable employment and after which the sting of any discrimination should have passed. *See, e.g., Dominic*, 652 F.Supp. at 820 (highly educated 52–year–old (at the time of jury verdict) plaintiff should be able to find comparable employment within five years of termination).

15. To some extent, Barbour validated this by finding employment with PHP within nine months of leaving CHW. There is no dispute, however, that the PHP position was not equivalent to the position at Medlantic.

Since the Court has awarded Barbour three years of back pay, the plaintiff will be made whole with one additional year of front pay (until June 18, 1993). The award will be offset by Barbour's actual interim earnings at CHW and what his earnings would have been had he not unreasonably left CHW on October 27, 1992.

## IV. The Award

The front pay award will be computed based upon a base salary of $70,000, commencing June 1, 1989,[16] with a salary increases of 5.3 percent annually effective on January 1st of each year.[17] This amount shall be offset by Barbour's actual interim earnings at CHW and what he would have earned at CHW had he remained there through June 18, 1993 (also computed with a salary increase of 5.3 percent annually).

The front pay award will be computed as follows:

| Date | Salary | Earnings | Offset | Award |
|------|--------|----------|--------|-------|
| 6/1/89 | $70,000 | -----Back pay previously awarded----- | | |
| 1990 | $73,710 | -----Back pay previously awarded----- | | |
| 1991 | $77,617 | -----Back pay previously awarded----- | | |
| 1992 [18] | $81,730 [19] | $43,888 [20] | $24,337 [21] | $19,551 |
| 1993 | $86,062 [22] | $39,849 [23] | $22,097 [24] | $17,752 |

**Subtotal** **$37,303.00**

16. The defendants argue that the award should be computed based upon a starting salary of $70,000 on June 18, 1992. While there is some support for such a reading of the Court of Appeals' opinion, this Court believes that it is more equitable to credit Barbour with raises to boost his starting front pay salary even though he is not entitled to such raises as part of his back pay award. It would be odd to deny Barbour the benefit of pay raises for the purposes of computing his front pay which would presumably have commenced had he been hired in 1989. The fact that Barbour waived entitlement to such pay raises in his back pay award by failing to request such annual percentage increases before this Court or on appeal is not at issue here.

17. The Court has selected the average of the percentage salary increases that Barbour received while at CHW as the appropriate annual salary increases. The Court rejects Barbour's contention that he is entitled to whatever percentage Rich received, because Rich's increases were merit-based, not position-based. Even though the percentage awarded may have been more or less than what Barbour actually would have received, the more equitable annual increase is one based upon Barbour's past performance.

18. Commencing June 18, 1992.

This subtotal amount, $37,303, must be discounted to the present value on June 18, 1992, and based upon the defendant's expert's testimony, the Court has selected six percent as an appropriate discount rate.[25] *See* Transcript of Evidentiary Hearing at 83 (July 9, 1996, p.m. session). Discounted to the present value on the date of judgment, the final award is calculated to be $36,239.86.[26] The plaintiff shall also be entitled to post-judgment interest as provided by law, from the date judgment in this case was entered, June 18, 1992, until the date the judgment is paid.

## V. Conclusion

Accordingly, it is hereby

**ORDERED** that the plaintiff is awarded $36,239.86 plus post-judgment interest as provided by law. Judgment shall be entered separately in accordance with Fed.R.Civ.P. 58.

IT IS SO ORDERED.

19. The equivalent of $223.92/day.

20. 196 days × $223.92/day = $43,888.

21. Based upon a CHW salary of $45,323/year: 196 days × $124.17/day = $24,337.

22. The equivalent of $235.79/day.

23. 169 days × $235.79/day = $39,849.

24. Based upon a salary of $47,725: 169 days × $130.75/day = $22,097.

25. Barbour's expert used a discount rate of 6.2%. The Court has selected the defendants' figure of 6% because it is more favorable to the plaintiff in discounting the award.

26. To discount the award, the Court relied upon the discount table in Becker & Seck, *Determining Economic Loss in Injury and Death Cases* § 5.03, at 64 (Table 5–1) and Appendix B (2nd ed. 1993). The wages earned over the course of the year have been discounted for an average of six months. *See Neal v. Director, District of Columbia Department of Corrections*, Civ.A.No. 93–2420 (RCL), 1995 WL 517249 *32 n. 12 (D.D.C. Aug. 9, 1995).